CLAYTON LIBBY & others[1] vs. COMMISSIONER OF CORRECTION.

Suffolk. November 2, 1981. — March 2, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Imprisonment. Constitutional Law*, Cruel and unusual punishment.

On evidence presented in an action challenging the conditions under which segregation unit prison inmates guilty of misconduct serve isolation time behind solid cell doors, the judge's findings that the ventilation system in the cell block was adequate when not interfered with by the inmates, that the temperature readings taken by the plaintiffs' expert were inconclusive, and that certain actions of the inmates had contributed to the high temperatures recorded in the cell block were not plainly wrong. [426-427]

In an action challenging the conditions under which segregation unit prison inmates guilty of misconduct serve time behind solid steel doors, the judge did not abuse his discretion in denying the plaintiffs' motion, presented the day before trial, for leave to amend their complaint to include an allegation of improper fire procedures in the cell block [428]; nor did he err in excluding evidence at trial on the issue of fire safety [428].

In an action by prison inmates challenging as unconstitutional per se the conditions in a segregation unit of the prison, the judge properly excluded evidence concerning disciplinary infractions which led to the confinement of individual inmates in the segregation unit. [428-429]

In an action by prison inmates challenging the conditions in a segregation unit of the prison there was no reversible error in the judge's exclusion of proffered testimony on behalf of the plaintiffs, relating to the effect of the challenged conditions upon prison discipline and to the availability of alternative methods of enforcing discipline. [430]

Confinement of segregation unit prison inmates guilty of misconduct behind solid cell doors for limited periods of time is not a punishment repugnant to contemporary standards of decency under either the Eighth Amendment to the United States Constitution or art. 26 of the Massachusetts Declaration of Rights. [431-435]

[1] The others are David Weichel and Paul Voner.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 24, 1979.

On transfer to the Superior Court Department the case was heard by *Brogna*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Ann Lambert Greenblatt (Judith A. Stalus* with her) for the plaintiffs.

*John W. Bishop, Jr.*, Special Assistant Attorney General, for the defendant.

LYNCH, J.  This case involves a challenge to the conditions under which prisoners serve isolation time in the departmental segregation unit in Block 10 of the Massachusetts Correctional Institution at Walpole (Walpole).  The plaintiffs, inmates of Block 10, allege that those conditions constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution[2] and art. 26 of the Massachusetts Declaration of Rights.[3]  Specifically, the plaintiffs seek declaratory and injunctive relief from the practice, authorized by the defendant, of confining inmates serving isolation time in Block 10 behind solid steel doors.

This action was originally filed in the Supreme Judicial Court for Suffolk County.  A single justice denied the plaintiffs' request for a preliminary injunction and ordered the action transferred to the Superior Court for trial.  The case was tried to a judge of the Superior Court who certified it as a class action on behalf of all persons who are or will be future inmates of Block 10 at Walpole.  See Mass. R. Civ. P. 23, 365 Mass. 767 (1974).  On February 8, 1980, the judge entered "Findings, Rulings and Judgment" denying all of the plaintiffs' requests for relief.  The plaintiffs appealed

---

[2] The Eighth Amendment is applicable to the States through the Fourteenth Amendment. *Robinson* v. *California*, 370 U.S. 660, 666-667 (1962).

[3] In their complaint the plaintiffs also alleged violations of various State statutory and regulatory provisions.  These claims have not been pursued in this court.

and we granted their request for direct appellate review. The plaintiffs urge us to find that the judge erred by failing to find that the challenged conditions amount to cruel and unusual punishment, by excluding certain evidence sought to be introduced by the plaintiffs, and by making a "clearly erroneous" finding of fact with respect to the adequacy of ventilation. We find no error.

The judge made extensive findings of fact on the basis of evidence presented during the five-day trial. These findings are, of course, binding on this court unless shown to be clearly erroneous. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). See also *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). We summarize the judge's findings with respect to the conditions in Block 10.

1. *Factual Background.*

a. *Physical conditions.* Walpole is the State's only maximum security prison and Block 10 is the departmental segregation unit at Walpole. Prisoners are transferred to Block 10 because of misconduct in the general prison population. G. L. c. 127, § 39. There are two upper and two lower tiers of cells in Block 10. The thirty cells on the lower tiers are used for isolated confinement. The cells are separated from the outside wall by a five foot wide corridor. There is a row of windows at the top of the outside wall which are often open during daylight hours and through which prisoners can see natural light. Each isolation cell measures six feet by nine feet and has three solid walls and a double door for the fourth wall. Both doors are opened manually with keys. The inside door is barred. The immediately adjacent outside door is solid steel. The outer door has a six inch square window at eye level and a voice box below the window. Some of the windows are open; others are covered by clear Plexiglas. When the solid door is closed, an inmate serving isolation time may speak through the voice box or through the window, if it is an uncovered one.

The cells contain a raised bed with mattress, a sink, a flush toilet, a built-in stool and table, and a hanging sixty-watt light bulb. The light is controlled by a master switch

outside the cells, although inmates may turn the light off from inside by unscrewing the bulb. Soap, a toothbrush, toothpaste, and toilet paper are the only personal possessions allowed.[4] Inmates serving isolation time receive three meals a day.[5] They are allowed to shower and shave twice a week and, obviously, they leave their cells for this purpose. While in isolation inmates may have a Bible and personal legal papers but no other reading material. There is no opportunity for outdoor exercise.

The judge found that the ventilation system for the isolation cells was adequate when not interfered with by inmates. This finding is discussed further below in connection with the claim that it is "clearly erroneous."

Inmates in isolation have limited contact with the prison world beyond the solid door. Six times a day the solid door is opened so that food trays may be passed in or taken out. The solid door is also opened when mail and medicine are delivered. Prisoners may receive visits from attorneys and chaplains. The judge also found that inmates in adjacent cells are able to communicate with each other by speaking, in a normal voice, through the window of the steel door (where it is an open one) or through the voice box.

b. *Isolation time policies.* Isolation time may be imposed on inmates who commit disciplinary infractions while in Block 10. This sanction may only be imposed after a three-member disciplinary board has found a prisoner guilty of a major infraction of the prison rules or serious misconduct in the general prison population. The prisoner may appeal the finding of guilty or the sanction of confinement in isolation. The plaintiffs do not challenge the fairness of these procedures.

By statute, confinement in an isolation cell may not exceed fifteen days for any one offense. G. L. c. 127, § 40.

---

[4] This appears in both parties' briefs although it was not noted in the judge's opinion.

[5] The judge noted that under G. L. c. 127, § 40, the statute allowing the use of isolation for the enforcement of discipline, only one full meal a day is required.

By order of the defendant Commissioner, no more than
thirty days of isolation may be imposed as a result of a single
incident regardless of how many separate offenses were in-
volved. Also by order of the Commissioner, at no time shall
any inmate be facing accumulated isolation sanctions of
more than thirty days even when numerous infractions have
been committed. If two fifteen-day isolation sanctions are
to be served, the inmate is removed from isolation for twenty-
four hours between the two periods. During this twenty-
four-hour break the solid door is left open and the inmate is
accorded the privileges enjoyed by inmates not serving isola-
tion time, including visits and exercise.

Currently, isolation time for inmates of Block 10 is served
with the solid door closed. The solid doors had also been
used in the past but their use was discontinued several years
ago. During the period when the doors were not closed, in-
mates threw significant amounts of debris into the corridor
outside the cells in Block 10 and then interfered with the at-
tempts of correctional personnel to clean the corridor. As a
result, the solid door policy was reinstituted in August,
1979. The supervisor of Block 10 testified that there has
been a significant decline in the number of assaults on staff
and other inmates as well as a decline in disciplinary infrac-
tions in general since the solid doors have been used. He
described Block 10 as "much cleaner" and "more orderly"
and said that, as a result, the morale of correctional officers
assigned to Block 10 has greatly improved.

One of the experts called by the plaintiffs testified on
cross-examination that some inmates of Block 10 who were
not serving isolation time had voluntarily closed the solid
doors of their cells, leaving them, in some cases, ajar only
"[a]n inch or two."

c. *Impact of solid doors on physical and mental health of
inmates.* Inmates serving isolation time have access to a
wide variety of health facilities. Medics visit the tiers of iso-
lation cells four times daily on an established schedule and
their presence is made known to the inmates. Psychiatric
counseling is available on a regular schedule each weekday.

A diversified group of medical personnel is available for treatment and consultation. The judge found that there had been no increase in medical problems or suicide attempts in Block 10 since the use of the solid doors was resumed in August, 1979. He reviewed the medical records of prisoners who had served solid-door isolation time and found that no physical illness had resulted from their confinement. Furthermore, the judge found that closing the solid doors did not increase the time that would be required to reach a distressed inmate.

Much of the testimony at trial related to the plaintiffs' allegation that confinement in closed-door isolation cells is damaging to the mental health of inmates. The judge concluded that there was no persuasive evidence that the use of the solid door causes any mental or emotional deterioration of a serious nature. The plaintiffs do not challenge the judge's findings on the psychological effects of closed-door confinement as clearly erroneous.

2. *Discussion.*

a. *Findings with respect to ventilation.*[6] The judge found (1) that the ventilation system in Block 10 was "adequate when it is not interfered with by the inmates," (2) that the temperature readings taken in eight isolation cells by the plaintiffs' expert were inconclusive, and (3) that the temperature in the cells was "hotter than necessary for comfort" but that certain actions of the inmates had contributed to this problem. The plaintiffs ask us to reject these findings as clearly erroneous. We have reviewed the relevant portions of the trial transcript and find no error. We summarize the evidence which was presented to the judge.

Each closed-door cell in Block 10 has two air vents, one at the top of the rear wall through which air is supplied to the cell and one at the base of the rear wall through which air is

---

[6] Under G. L. c. 127, § 40, as amended by St. 1957, c. 777, § 17, isolation cells must provide "light, ventilation and adequate sanitary facilities . . . ." In their complaint the plaintiffs set out a separate claim for relief based on a violation of this statute. In this court the plaintiffs cite the allegedly deficient ventilation only in support of their claims for relief under the United States Constitution and the Massachusetts Declaration of Rights.

exhausted. The air supply system draws some air from outside the building and some from basement areas. Some of the air supplied to the cells is heated first and is thus quite warm when it enters the cells. In an attempt to limit the amount of warm air which enters their cells when the solid door is closed, inmates frequently block the supply air vents with toilet paper or similar material. Robert Cashins, an industrial hygienist called by the plaintiffs, was the only expert to testify with respect to the adequacy of ventilation in the closed-door cells. On November 21, 1979, Cashins took temperature readings in the center of eight cells. The supply vents in these cells had been cleared five to ten minutes before the tests were made. The tests revealed temperatures ranging from a high of 90.5 degrees Fahrenheit to a low of 81.5 degrees Fahrenheit. The high was recorded in a cell on which the solid door had been closed for twenty minutes. Cashins testified that the other temperatures were recorded with the cell doors "open and closed; mainly they were open." On cross-examination, counsel for the defendant brought out that supply vents in some of the other cells on the tiers were still blocked at the time the temperature readings were taken and that this would tend to increase the temperature in cells with unblocked vents. Cashins also testified that, in his opinion, the volume of air supplied to the isolation cells was adequate for ventilation.

There was testimony that the automatic thermostats which control the temperature of the air entering the cells in Block 10 were not functioning but that the air temperature could be controlled manually upon request to power plant personnel. The supervisor for Block 10 testified that inmates frequently request such manual adjustments, that guards then inform power house employees, and that power house employees respond promptly to these calls. Only one inmate testified that guards failed to respond to his request that the heat be adjusted. Other inmates testified that they clogged the vent without first requesting a manual adjustment.

On this evidence, we cannot say that the judge's findings are "plainly wrong." *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 161 (1977).

b. *Exclusion of evidence.* The plaintiffs object to the judge's refusal to allow testimony with respect to the impact of the solid doors on fire safety. The procedural history of this issue is important to an understanding of the parties' positions. During the discovery stage of this litigation, the plaintiffs directed an interrogatory to the defendant seeking information and documents relative to fire safety. The defendant objected to these requests on the ground that the plaintiffs' complaint had not charged inadequate fire safety procedures in Block 10. The plaintiffs' motion to compel the defendant to answer their interrogatory was denied by a judge of the Superior Court. At a pretrial hearing on the day before trial began, the judge, relying on the prior denial of the motion to compel answers, granted a motion by the defendant to exclude evidence of fire safety at trial. The plaintiffs then sought leave to amend their complaint (Mass. R. Civ. P. 15 (a), 365 Mass. 761 [1974]), and the judge denied their request.

We find no error in the judge's rulings. The plaintiffs were on notice well before the start of trial that the defendant objected to the inclusion of fire safety as an issue for trial. They knew the grounds for the objection and they knew the objection had been upheld by a judge. They offer no excuse for their failure to seek leave to amend their complaint at an earlier stage of the litigation. Unexcused delay in seeking to amend is a valid basis for the denial of a motion to amend under Mass. R. Civ. P. 15 (a). *Castellucci* v. *United States Fidelity & Guar. Co.*, 372 Mass. 288, 290-292 (1977). *Shiretown Glass & Aluminum, Inc.* v. *Hamilton*, 5 Mass. App. Ct. 798 (1977). We cannot say that the judge abused his discretion in denying the plaintiffs leave to amend on the eve of trial. The judge was therefore justified in excluding the evidence which the plaintiffs sought to introduce on the fire safety issue at trial.

The plaintiffs also object to the judge's exclusion of testimony from inmates concerning the disciplinary infractions which led to their confinement behind the solid doors and testimony from several of the experts called by the plaintiffs

on the efficacy of using solid doors as a disciplinary tool and on alternative methods of enforcing discipline.

As to the first of these objections the defendant correctly points out that the plaintiffs made no offer of proof. The only indication of what the excluded testimony would have been is that an inmate-witness testified, before he was stopped by the objection of counsel for the defendant, that he was serving isolation time for "[t]hrowing water, throwing papers . . . ." The plaintiffs contend that evidence of the particular infractions committed by inmates serving isolation time should have been considered on the general issue of whether conditions in the isolation cells amounted to cruel and unusual punishment and on the question whether confinement under these conditions constituted punishment disproportionate to the offense for which it was imposed. The problem with the plaintiffs' position is that they have made their constitutional claims in very broad terms. In essence, their complaint charges that the isolation cells are per se unconstitutional and not just when used to punish particular inmates guilty of particular infractions of prison rules. The suit seeks relief on behalf of all inmates who are or will be confined in the isolation cells. As regards dispro-portionality, the plaintiffs must be understood to allege that confinement in a closed-door cell is disproportionate pun-ishment for any infraction at all. Under these circumstances, the judge was not required to hear evidence on individual offenses. The fact that a defense witness was allowed to tes-tify generally concerning the infractions for which isolation time is given does not change our conclusion. This testi-mony, and the regulation listing various offenses which was introduced through the witness, was clearly relevant to establish the role which the closed-door cells play in the en-forcement of internal discipline at Walpole. The plaintiffs are in a poor position to complain about the witness's later testimony about particular conduct that might be compre-hended in the regulation's list of offenses since this testi-mony was given in response to questions asked by the plain-tiffs' counsel on cross-examination. The judge committed no error in his treatment of this testimony.

The judge excluded certain testimony from two witnesses called by the plaintiffs to the effect that, in their opinion, the use of solid-door isolation cells would increase rather than decrease disciplinary problems in Block 10.[7]  The judge also sustained the objections of counsel for the defendant to questions seeking the opinions of these same witnesses as to whether there are alternative methods of enforcing prison discipline.  All of this testimony was excluded as irrelevant to the issues in the case.

It is clear, of course, that the opinions of experts as to the efficacy or desirability of a challenged prison practice " 'do not establish the constitutional minima.' "  *Rhodes* v. *Chapman*, 452 U.S. 337, 348 n.13 (1981).  The trial judge's duty in a case such as this one is only to determine whether a constitutional violation has been made out.  The judge has no authority to determine whether the challenged practice was "the best response" of the alternatives available to prison administrators.  *Id.* at 350.  The Supreme Court has also recognized, however, that such opinions "may be helpful and relevant with respect to some questions."  *Id.* at 348 n.13.

We conclude that the failure of the judge to admit this evidence does not warrant a reversal of the judgment below.  To some extent the excluded testimony on the efficacy of solid doors and the existence of alternative methods of discipline was merely cumulative of other testimony in the case.  One of the witnesses, for example, had already been allowed to testify to his opinion that solid doors were not a desirable prison practice.  In addition, as we explain further below, such testimony is of limited significance, under the standards established by the Supreme Court, on the central issue of whether a particular practice is constitutional.  Any error in the exclusion of this evidence was harmless.

---

[7] The substance of the excluded testimony appears in one case from the offer of proof made by the plaintiffs' counsel and in the other case from an answer given by the witness which was then struck on request of the defendant's counsel.

c. *Eighth Amendment claim.* The plaintiffs maintain that
confinement behind a solid door such as those described above
is per se unconstitutional under the Eighth Amendment to the
United States Constitution. While conceding that conditions
in the isolation cells in Block 10 do not otherwise violate con-
stitutional norms, the plaintiffs ask us to find that adding a
solid outer door to these same cells "push[es] us over the edge"
into unconstitutionality. They allege that the judge applied
an erroneous test in reaching his conclusion that no constitu-
tional violation had been shown.

The Eighth Amendment forbids both conditions of con-
finement which, "although not physically barbarous, 'in-
volve the unnecessary and wanton infliction of pain'" and
conditions which are "grossly disproportionate to the severity
of the crime." *Rhodes* v. *Chapman,* 452 U.S. 337, 346
(1981). Infliction of pain which is "'totally without penolog-
ical justification'" is "'cruel and unusual'" within the mean-
ing of the Amendment, *id.* at 2398, quoting *Gregg* v. *Geor-
gia,* 428 U.S. 153, 183 (1976), and inmates must be afforded
at least "the minimal civilized measure of life's necessities."
*Rhodes* v. *Chapman, supra* at 347. When particular condi-
tions are challenged as cruel and unusual, reference must be
made to "the evolving standards of decency that mark the
progress of a maturing society." *Trop* v. *Dulles,* 356 U.S. 86,
101 (1958). Although there is no fixed test, courts should pay
special attention to objective factors in deciding whether a
practice violates "the contemporary standard of decency."
*Rhodes* v. *Chapman, supra* at 347.

We agree with the trial judge that closing the solid doors
for periods of not longer than fifteen days as punishment for
Block 10 inmates guilty of disciplinary infractions does not
constitute cruel and unusual punishment under the stand-
ards articulated by the Supreme Court. There is no claim
that inmates confined in these cells are deprived of adequate
food, clothing, sanitation, or opportunities for personal
hygiene. The judge found that closing the solid door did
not deprive the inmates of access to medical care or cause
physical illness and the plaintiffs have not challenged these

findings. The plaintiffs also do not challenge the judge's finding that the solid doors cause no serious or lasting mental damage.

In their brief the plaintiffs place considerable emphasis on their claim that confinement behind the solid doors results in severe sensory deprivation and that it is cruel and unusual punishment to deprive them of "meaningful communication with other persons." We agree with the judge that deprivations of this sort do not rise to the level of a constitutional violation. The judge found that communication between inmates in isolation cells was possible, that inmates have daily contact with those who bring their food, mail, and medicine, and that they leave their cells twice weekly to shower. The judge's further finding that the level of sensory deprivation in the isolation cells did not cause psychological harm was supported by the evidence. The "isolation" and "loneliness" of which the plaintiffs complain is not in and of itself unconstitutional. *Bono* v. *Saxbe,* 620 F.2d 609, 614 (7th Cir. 1980). *Sweet* v. *South Carolina Dep't of Corrections,* 529 F.2d 854, 860-861 (4th Cir. 1975).

We have no doubt that time spent in a closed-door cell in Block 10 is anything but comfortable. "But the Constitution does not mandate comfortable prisons . . . ." *Rhodes* v. *Chapman, supra* at 349. Conditions may be "restrictive and even harsh" without violating constitutional norms. *Id.* at 347. *Hawkins* v. *Hall,* 644 F.2d 914, 918 (1st Cir. 1981). *Sweet* v. *South Carolina Dep't of Corrections,* 529 F.2d 854, 860-861 (4th Cir. 1975).

Solitary confinement, under conditions which do not offend contemporary standards of decency, is not per se unconstitutional. *Hawkins* v. *Hall, supra* at 917. *Sostre* v. *McGinnis,* 442 F.2d 178, 192 (2d Cir. 1971) (en banc), cert. denied, 405 U.S. 978 (1972), and cases cited. We deem it significant that inmates are not kept in isolation for extended periods and that they know in advance when they will be removed from isolation. Cf. *Hutto* v. *Finney,* 437 U.S. 678 (1978) (upholding order forbidding sentencing of inmates to more than thirty days in punitive isolation).

It must be remembered that the solid-door isolation cells are used to enforce discipline among inmates already confined in Walpole's "segregation unit." Conditions in Block 10 are necessarily more restrictive than conditions for the general prison population. The defendant Commissioner could reasonably believe that Block 10 inmates could be deterred from committing further infractions of prison rules only if the punishment for such infractions was confinement under even more restrictive conditions. As the Supreme Court has said, "An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses." *Pell* v. *Procunier*, 417 U.S. 817, 822 (1974). The use of solid doors to enforce discipline in Block 10 is analogous to the use of prisons generally to enforce compliance with criminal laws.

The adoption of measures designed to preserve a prison's internal security is a matter "normally left to the discretion of prison administrators." *Rhodes* v. *Chapman*, 452 U.S. 337, 349 n.14 (1981). See also *Pell* v. *Procunier, supra* at 823; *O'Brien* v. *Moriarty*, 489 F.2d 941, 944 (1st Cir. 1974). In this case there was evidence that closing the solid doors as a disciplinary device was an effective means of restoring order, reducing violence, and improving cleanliness in Block 10. Furthermore, two of the expert witnesses called by the plaintiffs testified on cross-examination that they had seen solid doors in use in other State prison systems. The evidence clearly supported a finding that closing solid doors on isolation cells is neither "totally without penological justification" (*Gregg* v. *Georgia, supra* at 183), nor offensive to "contemporary standard[s] of decency" (*Rhodes* v. *Chapman, supra* at 347) nor "grossly disproportionate" to the severity of any offense for which this sanction could be imposed (*id.* at 346).

The plaintiffs tried to show at trial that there are other and more effective means of enforcing discipline than clos-

ing solid outer doors. We have no doubt that there are different schools of thought on the subject of internal security in prisons. But "[p]rison administrators . . . should be accorded *wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline* . . . ." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). "The mere fact that different measures might have worked or might still be workable does not allow a . . . court to substitute its judgment for that of prison officials." *O'Brien* v. *Moriarty, supra.*

The plaintiffs contend that the judge applied an erroneous test in resolving the constitutional issue. The claim is that the judge found the use of solid doors constitutional because the named plaintiffs had not proved that they personally had suffered actual lasting physical or psychological damage. We agree with the plaintiffs that an inmate need not wait until actual harm results in order to challenge conditions of confinement as "cruel and unusual." However, the judge's rulings here cannot be construed as imposing such a requirement. The judge reached his conclusion that the use of solid doors is constitutional after a careful consideration of many relevant factors, including possible dangers to the physical and mental health of inmates. In assessing the potential impact of solid doors on the health of inmates, he was clearly entitled to consider whether any of the individuals who testified at trial or were examined by the plaintiffs' experts had in fact suffered such an injury. Actual experience under the closed-door policy was obviously relevant to the general claim of a threat to inmates' health. There is no basis for the plaintiffs' claim that the judge ruled in the defendant's favor because he found no actual mental or physical injury had been established.[8]

---

[8] To some extent the plaintiffs' claim in this regard seems based on the judge's exclusion of testimony from two of the plaintiffs' witnesses concerning the possible long-term effects of confinement behind steel doors. In this court the plaintiffs did not argue that it was error to exclude this evidence. We deem any argument based on the exclusion of this evidence to have been waived. In any event, expert testimony that particular con-

The plaintiffs cite us to cases in which cells with solid outer doors were found to violate the Eighth Amendment. In each of these cases, however, factors other than the solid door contributed heavily to the finding of unconstitutionality. See, e.g. *M.C.I. Concord Advisory Bd.* v. *Hall*, 447 F. Supp. 398 (D. Mass. 1978) (long-term double celling of protective custody inmates); *Nelson* v. *Collins*, 455 F. Supp. 727 (D. Md.), aff'd sub nom. *Johnson* v. *Levine*, 588 F.2d 1378 (4th Cir. 1978) (inadequate medical care, confinement for extended periods); *Laaman* v. *Helgemoe*, 437 F. Supp. 269 (D.N.H. 1977) (inmates stripped to underwear or naked, no beds or interior light, no guard in area or regular checking); *Bel* v. *Hall*, 392 F. Supp. 274 (D. Mass. 1975) (deprivation of elementary sanitary facilities, cells used to house ordinary inmates not accused of violating any rules); *Craig* v. *Hocker*, 405 F. Supp. 656 (D. Nev. 1975) (insufficient clothing and facilities for personal hygiene, "hole in floor" toilets flushed from outside cells).

3. *Claim under art. 26 of the Declaration of Rights.* The plaintiffs urge us to find that the use of solid-door cells is prohibited by art. 26 of the Declaration of Rights of the Commonwealth, which forbids the infliction of "cruel or unusual punishments." Article 26, like the Eighth Amendment, bars punishments which are "unacceptable under contemporary moral standards." *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648, 661-662 (1980). We need not define the exact contours of the protection afforded by art. 26. We hold that the confinement of segregation unit inmates guilty of misconduct behind solid doors for limited periods of time is not a punishment repugnant to contemporary standards of decency under either the Eighth Amendment or art. 26.

*Judgment affirmed.*

ditions of confinement could cause psychological harm would not compel a finding of unconstitutionality. *Bono* v. *Saxbe*, 620 F.2d 609, 614 (7th Cir. 1980). *Sostre* v. *McGinnis*, 442 F.2d 178, 190-193 & n.24 (2d Cir. 1971) (en banc), cert. denied, 405 U.S. 978 (1972).