**Manuel FERREIRA, pro se, Plaintiff,**

v.

**Ronald DUVAL, et al., Defendants.**

**Civ. A. No. 94–10216–PBS.**

United States District Court,
D. Massachusetts.

May 12, 1995.

Manuel Ferreira, Lawrence, MA, pro se.

Charles M. Wyzanski, Mass. Dept. of Corrections, Boston, MA, for Ronald Duval, Phillip Harrington, Jeffrey Sherwin.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Pursuant to 42 U.S.C. § 1983, plaintiff Manuel Ferreira ("Ferreira"), proceeding *pro se*, seeks damages for the defendants' alleged violations of his equal protection and due process rights during his confinement in the Departmental Disciplinary Unit ("DDU") as a result of his leadership role in a group demonstration on June 12, 1993. The defendants have moved to dismiss the plaintiff's claims, or, in the alternative, for summary judgment.

The Court **ALLOWS** defendants' motion for summary judgment on plaintiff's claims that he was denied equal protection and due process of law at his disciplinary hearing (Counts I and II), that his transfer was illegal (Count III), and that his First Amendment rights were violated (Count V). The Court **DENIES** defendants' motion for summary judgment on plaintiff's claims that placement in DDU was in violation of G.L. c. 127, § 40 (regulating time periods for placement in isolation) (Count IV) and that he was deprived of adequate legal access (Counts VI through X).

### FACTS

1. *Disciplinary Hearing*

On August 11, 1993, Ferreira received a hearing on six disciplinary charges arising out of an incident on June 12, 1993. Defen-

dant Jeffrey Sherwin presided as Special Hearing Officer for DDU. Based on the hearing, Officer Sherwin could have found the following facts.

On June 12, 1993, Ferreira and 16 other inmates at MCI–Cedar Junction walked out of Chow Hall and entered the main corridor of the facility to inquire about the recent lock-up of several Hispanic inmates. Ferreira approached Deputy Superintendent Mark Powers about the lock-up. Inner Perimeter Security (IPS) Sergeant Daniel Charpentier ("Charpentier") said Powers would not deal with the inmates as a group and he ordered the people to go back and disperse. Some inmates responded: "No ... we're here together." None dispersed.

Charpentier then instructed the group to select two individuals to speak for them. The group asked Ferreira to be the spokesman. He agreed. Ferreira described the group dynamic as follows: "And when we were there, they asked me, they said 'Manny, could you speak,' it wasn't like this was a preplanned thing, and they said, you know, Manny, your gonna be the leader." your gonna go in, and your gonna—when we go out there." Ferreira was chosen to be a spokesman because he was always working in the law library and spoke English well. Ferreira was one of two individuals who could speak English fluently.

As a result of the group demonstration, all the gates were locked and blocks were secured. The tactical unit was activated because of disturbances in some of the housing units flowing from the demonstration. Tactical unit personnel put the inmates in restraints and dispersed them. After the incident, Ferreira was transferred to the Receiving Building at MCI–Norfolk on Awaiting Action ("AA") status.

At the hearing, Ferreira explicitly denied being a leader of the incident. Charpentier was the only witness to testify other than Ferreira himself:

> MR. SHERWIN: You've heard [Ferreira's] testimony, is there anything of what he said that you would—that you would disagree with as far as the account of events, as far as his actions go?

> MR. CHARPENTIER: As far as his actions go?

> MR. SHERWIN: Yes.

> MR. CHARPENTIER: No I wouldn't.

On August 17, 1993, Sherwin found Ferreira guilty of three of the six offenses (# 1, # 8, # 14), and sentenced him to one month (time served) in DDU for # 1, (disobeying an order, lying to or insolence towards a staff member), and five concurrent months in DDU for # 8 (conduct with disrupts or interferes with the security or orderly running of the institution) and # 14 (participation in or encouraging ... unauthorized group demonstration). Under "Reasons for Sanctions," Sherwin noted that:

> Ferreira is presently serving a 10–11 year sentence for Trafficking in Cocaine. Since his incarceration began in 1990, he has received 16 D–Reports with fourteen containing charge # 8, and thirteen for # 1. *Voluntarily* coming forward to act as a spokesman for the group Ferreira *assumes* the role of a leader and must be held accountable for that action. Ferreira and the others must also be held accountable for the incidents that their action induced. No consideration is given for reduced sanction due to lack of admissions of guilt.

Only three other inmates were found to have had some leadership role in the June 12 incident. Two of them received four months in the DDU. Another, Eddie Santiago, had only two prior disciplinary infractions, and he was sentenced to two months in DDU. Nine other inmates involved in the incident were found to be mere "participants." Two of these inmates had more than 20 prior disciplinary reports. Five others pled guilty to the disciplinary violations charged against them. None of these nine "participants" received any DDU sanction.

Although the record is unclear, Ferreira apparently appealed the findings of his disciplinary hearing on three points: (1) unequal treatment; (2) length of DDU sanction violated Massachusetts law; and (3) erroneous fact finding by the hearing officer. His appeal was denied. The Commissioner adopted the recommendation of a DDU sanction on September 8. However, Ferreira was held

in awaiting action status because of unavailability of bed space in DDU.

### 2. *Conditions at DDU*

On November 19 or 20, 1993, Ferreira was transferred from MCI–Norfolk to the DDU at MCI–Cedar Junction. According to defendant Superintendent Ronald Duval, conditions in the DDU are "fairly onerous." DDU inmates are locked behind solid cell doors. They are fed in their cells. At least for the first 30 days, DDU inmates are allowed no social visits, telephone, radio or television. Inmates are not permitted general correspondence with other inmates. An inmate gets a one-hour solitary recreation period for every five days.

While in DDU, Ferreira's access to legal materials was limited. Defendant Duval states that "[t]he DDU has within its confines no secure area to house an extensive law library." Instead, Ferreira had access to a book cart of legal materials for a minimum of two hours per week. The actual content of the book carts is disputed by the parties. To obtain materials from the main law library at MCI–Cedar Junction, Ferreira said he had to provide exact citations, and some of his requests were not honored. Also disputed is the extent to which an inmate in DDU gets access to legal assistance from trained inmate clerks. Although DDU regulations permitted Ferreira to consult with outside counsel, no inmate law clerks are permitted in the DDU.

Because he received credit for all but fifteen days spent in the awaiting action unit until a DDU bed was available, Ferreira served in the DDU for a total of approximately 92 days; he was released back into the general prison population on February 18, 1994.

### DISCUSSION

### A. *Standards for Dismissal and Summary Judgment*

Because both sides have submitted affidavits, the Court treats the motion under the standards governing motions for summary judgment. A motion for summary judgment must be granted if

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). "If this is accomplished, the burden then 'shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party].'" *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir.1994), quoting *Rogers v. Fair*, 902 F.2d at 143 (internal citations omitted). Mere allegations are insufficient to defeat a summary judgment motion; rather, "the nonmoving party must adduce specific, provable facts which establish that there is a triable issue." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d at 91.

### B. *The Hearing*

Plaintiff claims he was denied equal protection of the law in violation of the Fourteenth Amendment. The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Absent any allegation that prisoners are receiving different treatment based on "suspect classifications" (e.g., race), "[t]he appropriate analysis for an equal protection claim is whether the unequal treatment bears a reasonable relationship to legitimate penological interests." *Griffin v. Coughlin*, 743 F.Supp. 1006, 1010 (N.D.N.Y.1990); *see Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987) (prison regulations must only bear a rational connection to legitimate state interests).

■ Absent a clear abuse of discretion, prison officials are to be accorded "the full latitude of discretion" in their decisions. *Cf. Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136, 97 S.Ct. 2532,

2543, 53 L.Ed.2d 629 (1977) (prisoner's groups were sufficiently distinct that administrators' allowance of some groups but not others did not violate prisoners' equal protection rights).

■ Ferreira contends that the difference between his penalty (six months in DDU) and the sanctions received by the other participants bears no rational relationship to legitimate penological interest. A review of the disciplinary hearing reports suggests otherwise. First, Ferreira was one of four individuals whom the hearing officer found to be a leader of the demonstration. Second, according to documents presented by the plaintiff, Ferreira had a greater number of prior, similar disciplinary infractions than most of the other participants. Third, while many of the other inmates accepted responsibility for the incident, Ferreira did not. Where, as here, Ferreira's situation is not sufficiently similar to the other participants, and his penalty is rationally related to legitimate penological interests, his equal protection claim must fail.

■ Ferreira also contends that the hearing officer had no factual basis for the conclusion that he was a "leader" of the demonstration. However, the record amply supports the hearing officer's finding that he voluntarily assumed the position as spokesman for the group because of his legal experience and English-speaking abilities. Summary judgment is *ALLOWED* on Counts I and II, the equal protection and due process claims.[1]

C. *The Transfer*

■ Relying on G.L. c. 127, § 97, Ferreira claims that his transfer from MCI–Cedar Junction to MCI–Norfolk Receiving Building violated his due process rights because it was not approved by the Commissioner of Corrections. G.L. c. 127, § 97 provides that "[t]he commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another." Massachusetts regulations provide as follows:

At the discretion of the Superintendent or his/her designee, and subject to any applicable review requirements, an inmate who is under investigation for a possible disciplinary offense, or who has been discharged with or found guilty of a disciplinary offense, may be placed on awaiting action status at the institution where he/she is then confined.

103 Code Mass.Regs. § 430.21(1) (5/29/87). The procedures for transferring an inmate are set forth in 103 Code Mass.Regs. § 420.00 which provide for transfers to a higher security setting prior to a classification hearing and decision by the commissioner while an inmate is being investigated for a disciplinary offense "should security needs so dictate." *See* 103 Code Mass.Regs. § 420.09(3)(a) (4/10/92).

■ The due process clause does not confer upon a prisoner any liberty interest in being held in the general prison population. *Hewitt v. Helms*, 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). State laws or regulations may create a protected liberty interest if by setting forth "explicitly mandatory language" and "specified substantive predicates," they place "substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). *Accord Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989).

The First Circuit has held that an earlier, but similar, version of the regulations governing awaiting action placements creates a liberty interest protected by the due process clause because they permit prison officials to place an inmate in awaiting action status only upon the occurrence of certain conditions such as pending investigation, hearing of disciplinary offense, or pending reclassification to higher custody status. *Stokes v. Fair*, 795 F.2d 235, 237 (1st Cir.1986). Here, there is no dispute that Ferreira was being investigated for a disciplinary infraction. The regulations permit transfer to awaiting action status whether in the same institution or anoth-

---

1. Plaintiff also claims his First Amendment rights were violated by his confinement to DDU but does not press his point in the memorandum. In any event, there is no record support for any claim that he was retaliated against for the substance of his speech.

er one, prior to a formal classification hearing or transfer decision by the commissioner.

Moreover, there is no allegation in the Amended Complaint that Ferreira was confined in violation of the due process clause without the periodic fifteen day review, required by regulation. *See Puckett v. Commissioner of Correction,* 28 Mass.App.Ct. 448, 451, 551 N.E.2d 1228 (1990) (plaintiff's confinement in awaiting action status for over five months without review held unreasonable as a matter of law). There is also no argument that the period of confinement while awaiting a bed in DDU was unreasonable. *See id.* ("The rule of reason ... dictates the point beyond which awaiting action status lawfully may not be continued under the applicable regulations."). If anything, plaintiff benefited by the lack of beds in DDU as he received full credit for the time spent in awaiting action status except for 15 days.

Even if there were a violation of the procedures for placing plaintiff in awaiting action status, the record before the Court does not support a claim that any such violation amounts to the deprivation of a liberty interest. Count III is therefore ***DISMISSED.***

### D. *Ferreira's DDU Sentence*

◼ Ferreira contends that defendants violated M.G.L. ch. 127, § 40 by placing him in DDU for 92 days. M.G.L. ch. 127, § 40 provides that "[f]or the enforcement of discipline, an inmate in any correctional institution of the commonwealth may, at the discretion of its superintendent, be confined, for a period not to exceed fifteen days for any one offence [sic], to an isolation unit." Massachusetts regulations, 103 Code Mass.Regs. § 430.22(2) (12/01/93), provides: "No inmate shall be retained in isolation continuously for more than 15 days for any one violation. No more than 30 days isolation shall be imposed on an inmate for all violations arising out of the same or substantially connected incident(s) unless specifically authorized by the Commissioner." Pursuant to 103 Code Mass.Regs. § 430.22(1) (12/1/93), an inmate may be placed in isolation only pursuant to a sanction imposed by the hearing officer.

Because section 40, and these regulations, amount to a mandatory, substantive restriction, Massachusetts has created for its inmates a liberty interest against isolation time for periods exceeding fifteen days per "offense" or "violation." *See Hewitt v. Helms,* 459 U.S. at 472, 103 S.Ct. at 871.

In two recent cases, other judges of this court have concluded, based on the record before them, that the DDU did not violate G.L. ch. 127, § 40. *See Abrazinski v. Dubois,* 876 F.Supp. 313, 319 (D.Mass.1995) (although DDU is a "confined and segregated" environment, it is not an isolation unit because it allows regular, though brief, contact with other inmates); *Bonds v. Dubois,* 1994 WL 725205, at *4 (D.Mass.1994) (inadequate evidence presented by plaintiff to support claim that DDU cell tantamount to isolation unit).

Here, Duval, as the Superintendent of MCI–Cedar Junction (Walpole), which encompasses the Department Disciplinary Unit, submitted an affidavit stating:

> Conditions in the DDU are far more onerous than those that apply to inmates on awaiting action status. Thus, inmates on AA status are at all times allowed social visits, a television, and a radio; DDU inmates are not. *Inmates on AA may look out a grill door onto the tier; DDU inmates are prevented from doing so by closed, solid doors.* (emphasis added).

In *Libby v. Commissioner of Correction,* 385 Mass. 421, 431–32, 432 N.E.2d 486 (1982), the Supreme Judicial Court rejected a challenge to the use of solid door isolation cells "for limited periods of time" under the Eighth Amendment and Article 26 of the Declaration of Rights. However, it pointed out that confinement in an isolation cell may not exceed fifteen days for any one offense under G.L. c. 127, § 40, and that by order of the commissioner, "no more than thirty days of isolation may be imposed as a result of a single incident, regardless of how many separate offenses were involved." *Id.* at 425, 432 N.E.2d 486. If two fifteen-day isolation sanctions are to be served, according to the order described in *Libby* in 1982, the inmate is removed from isolation for twenty-four hours between the two periods: the solid

door is left open and the inmate can get visits. *Id.*

The record is inadequate for a ruling on plaintiff's claim that his due process rights were violated by a 30–day placement in DDU. The Superintendent's own description of the DDU cell, read in conjunction with the handbook governing the first 30 days in DDU, creates a disputed issue of fact as to whether placement in DDU is tantamount to isolation. Under the regulations, only if an inmate does not misbehave for thirty days does he get privileges such as social visits, radio and television, and phone calls. During the first thirty days, he has no such privileges. Even if the DDU cell were deemed to be isolation during the first thirty days, that does not resolve plaintiff's due process claims because plaintiff was convicted of two offenses arising out of the same incident. However, the hearing officer did not impose isolation as a sanction, and the sentence on the two charged offenses appears to be a concurrent one. The record contains inadequate information concerning the Commissioner's current policies governing placement in solid door isolation cells for a continuous thirty-day period for multiple offenses, in particular, whether the twenty-four hour break rule still applies. Accordingly, summary judgment is **DENIED** on Count IV.

### E. *Ferreira's Legal Access in DDU*

■ Ferreira contends in Counts VI through X that the defendants impaired his due process right of access to the courts by failing to provide him with adequate legal resources while he served his sentence in the DDU. It is well established that the due process clause entitles prisoners to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). *Accord Beauchamp v. Murphy*, 37 F.3d 700, 704 (1st Cir.1994) (constitutional right of access to courts). The First Circuit has held that time limits on library access of at most three hours per month per inmate seeking to conduct research "invites scrutiny" and that the requirement that inmates identify the specific volumes they wish to use prior to entering

the library is also "suspect." *Cepulonis v. Fair*, 732 F.2d 1, 4 (1st Cir.1984) (involving the Departmental Segregation Unit); *see also Nadeau v. Helgemoe*, 561 F.2d 411, 418 (1st Cir.1977) (rejecting one hour per week even where limited staff assistance present), *appeal after remand*, 581 F.2d 275 (1st Cir. 1978).

■ In some cases, plaintiffs seeking access to legal materials need not show an actual injury resulting from a lack of adequate legal resources. In *Sowell v. Vose*, 941 F.2d 32, 34–35 (1st Cir.1991), the First Circuit ruled:

> ... where 'the challenge is systemic, embracing the basic adequacy of materials and legal assistance made available to all or subgroups of the prison population ... [or where] the conditions challenged obviously go to the heart of any meaningful access to libraries, counsel, or courts,' ... imposition of an 'actual injury' requirement would be superfluous. A prisoner need not show that the deprivations caused him an independent injury where the deprivation is so significant as to constitute an injury in and of itself.

*Id.* (internal citations omitted). *See Parzyck v. Dubois*, 1994 WL 606314, at *5–7 (D.Mass. November 4, 1994) (Ponsor, J.) (where certain legal materials like Shepard's not available, inmate stated viable claim pertaining to adequacy of law library, even without actual injury).

In this case, there is no evidence of any actual damage as a result of the level of legal resources available to Ferreira while in the DDU. On the other hand, he has presented evidence of systemic deprivations, lack of adequate materials on civil procedure, prison and constitutional laws, inability to pass or receive legal materials from other inmates, lack of any guides for researching the DDU law library system, and no alternative methods of access to the courts such as an inmate trained person in the law. He also has presented evidence that he requested certain legal materials which were not provided, or xeroxed, and that he could not obtain legal materials without a citation.

Commissioner Duval has submitted an affidavit disputing some of these allegations, stating that the DDU inmates have available to them the services of MCI–Cedar Junction's law librarian and inmate law clerks, who have been selected based on "their exposure to legal research and the rudiments of prisoner rights law." He also points out that "DDU inmates can obtain from them any legal materials which they identify, either by name or general topic." This presents a disputed issue of fact.

■ Defendants argue that the claim of inadequate access to legal materials is moot because plaintiff is no longer in DDU. As a threshold matter, plaintiff is seeking compensatory damages, not declaratory or injunctive relief, and may recover nominal damages for the deprivation of a constitutional right. *See Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978) (holding denial of procedural due process warrants nominal damages despite lack of actual injury); *Fox v. Board of Trustees of the State University of N.Y.,* 42 F.3d 135, 141 (2d Cir.1994) (plaintiffs not entitled to nominal damages for constitutional deprivations where they sought only declaratory and injunctive relief, and controversy has since been rendered moot). *Compare I.D. v. Marston,* 1994 WL 774533, at *4 n. 4 (D.N.H. 1994) (nominal damages denied where plaintiff's right to accommodation due to handicap was not "absolute"); *Davet v. Maccarone,* 973 F.2d 22, 30 (1st Cir.1992) (refusing to set aside jury verdict denying nominal damages for constitutional violation, noting that verdict demonstrated jury did not find liability).

■ Moreover, this case falls within the exception to the mootness doctrine because the alleged illegal conduct in this case is a "wrong capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515–16, 31 S.Ct. 279, 283–84, 55 L.Ed. 310 (1911); *see also Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532 (1975) (discussing development of 'capable of repetition, yet evading review' exception to mootness doctrine); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (applying exception to mootness doctrine, finding termination of pregnancy did not render case moot). The history of this case itself highlights the applicability of that exception as plaintiff sought a temporary restraining order to obtain access to legal materials, which was moot before the Court got a response from the government (Docket # 8). Where this exception applies, a federal court may retain jurisdiction over the plaintiff's claim notwithstanding the fact that it has become moot if the complaining party has a "reasonable expectation" or "demonstrated probability" that he would be subjected to the same action again. *See, e.g., Weinstein v. Bradford,* 423 U.S. 147, 148–49, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975) (plaintiff's challenge to procedural violation by Parole Board dismissed as moot because plaintiff had since been released from supervision); *CMM Cable Rep. Inc. v. Ocean Coast Properties, Inc.,* 48 F.3d 618, 621 (1st Cir.1995) (discussing exception to mootness rule); *Oakville Dev. Corp. v. Federal Deposit Ins. Corp.,* 986 F.2d 611, 615 (1st Cir.1993) (plaintiff's suit to enjoin foreclosure sale and subsequent appeal was moot because sale had occurred and plaintiff failed to demonstrate likelihood of suffering same fate again). Here, plaintiff has a far from exemplary disciplinary record, and five years left on his prison sentence: he has a reasonable expectation of DDU confinement again.

■ As a prudential matter, the Court is concerned that the claim of inadequate legal access is being litigated in *Torres v. Dubois,* Civ. Action No. 94–0270–E (Suffolk Sup.Ct.), filed by experienced counsel at Palmer & Dodge, and the American Civil Liberties Union. This may be a better vehicle than this *pro se* plaintiff, no longer in DDU, to present the systemic challenge to legal resources in DDU. *Cf. S–1 and S–2 v. Spangler,* 832 F.2d 294, 297 (4th Cir.1987) (discussing court's discretionary power to withhold relief for prudential reasons); *See also* 13A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure 2d § 3533.1 at 223 (1984 & Supp. 1993). However, the motion for class certification in the state action has been denied. Moreover, plaintiff here is requesting damages for his deprivation of adequate access to legal materials, not for equitable or declara-

tory relief. The Court concludes that the case should be not be stayed pending the outcome of state court proceedings.

### F. *Excessiveness of Sentence*

 Plaintiff argues that his sanction should have commenced on August 18, 1993 and ended on January 30, 1994. Because he was not released until February 18, 1994, he seeks compensatory damages for the nineteen days he was held in DDU. However, the government argues that the sentence did not commence until the Commissioner approved the recommended sentence to the DDU on September 8. This twenty-one day hiatus accounts primarily for the disagreement between the parties as to the period of confinement pursuant to 103 Code Mass. Regs. § 421.09. Because plaintiff appealed the decision, the sentence was properly calculated as of the date of the decision on appeal. *See* 103 Code Mass.Regs. § 430.14.

### *ORDER*

The Court *DISMISSES* Counts I, II, III and V. The Court *DENIES* the motion for summary judgment on Counts IV, and VI through X.[2]

---

**2.** The Court does not address the issue of qualified immunity which was not raised by defen- dants.