UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 93-2048
No. 94-1142 

 BRENDAN MCGUINNESS,

 Plaintiff, Appellant,

 v.

 LARRY E. DUBOIS, ET AL.,

 Defendants, Appellees.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]
 

 

 Before

 Breyer, Chief Judge,
 
 Boudin and Stahl, Circuit Judges.
 

 

Brendan M. McGuinness on brief pro se.
 
Nancy Ankers White, Special Assistant Attorney General, and
 
Rosemary Ford, on briefs for appellees.
 

 

 May 11, 1994
 

 Per Curiam. The plaintiff, Brendan McGuinness, an
 

inmate at the Massachusetts Correctional Institution at Cedar

Junction, filed a complaint, pursuant to 42 U.S.C. 1983,

against eight prison administrators and officers. McGuinness

has appealed a district court order granting summary judgment

in favor of the defendants and denying his request for a

preliminary injunction. We affirm.1

 I.

 We review the grant of summary judgment de novo,

employing the same standards as is required of the district

court, Webb v. Internal Revenue Serv., 15 F.3d 203, 205 (1st
 

Cir. 1994), and mindful of our duty to review the record in

the light most favorable to the nonmoving party, Shinberg v.
 

Bruk, 875 F.2d 973, 974 (1st Cir. 1989).
 

 A motion for summary judgment must be
 granted if "there is no genuine issue as
 to any material fact and ... the moving
 party is entitled to a judgment as a
 matter of law." Fed. R. Civ. P. 56(c).
 To succeed, the moving party must show
 that there is an absence of evidence to
 support the nonmoving party's position.
 Having done so, the burden shifts to the
 nonmoving party to establish the
 existence of an issue of fact that could
 affect the outcome of the litigation and
 from which a reasonable jury could find
 for the opponent. It is settled that the
 nonmovant may not rest upon mere
 allegations, but must adduce specific,

 

1. Our affirmance of the grant of summary judgment
necessarily is an affirmance of the denial of the preliminary
injunction request. We, therefore, do not address separately
the preliminary injunction issue.

 -2-

 provable facts demonstrating that there
 is a triable issue. There must be
 sufficient evidence favoring the
 nonmoving party for a jury to return a
 verdict for that party. If the evidence
 is merely colorable or is not
 significantly probative, summary judgment
 may be granted.

Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990) (internal
 

quotations and citations omitted).

 II.

 In February 1992, McGuinness admitted to attempting to

flush his sweatshirt down the toilet in his cell. He was

found guilty of three disciplinary offenses2 with respect to

this incident. McGuinness' institutional folder was then

reviewed. He had had 44 disciplinary reports in two years,

including six assaults on staff, four violations for

possession of a weapon, and two drug-related offenses. At

the time of the flushing incident, McGuinness was in the

prison's Departmental Segregation Unit (DSU) for assaulting a

staff member. After reciting this, the hearing officer

stated:

 [t]his inmate exhibits assaultive along
 with disruptive behavior both in general
 population and segregation. The conduct
 that the inmate has displayed makes him a
 viable candidate for DDU. This type of

 

2. 103 CMR 430.24(3): Failure to keep one's person or one's
quarters in accordance with institutional rules; 103 CMR
430.24(8): Conduct which disrupts or interferes with the
security or orderly running of the institution; 103 CMR
430.24(22): Willfully destroying or damaging state property
or the property of another person.

 -3-

 defiant behavior, along with total
 disregard for the rules and regulations
 of the institution is unacceptable and
 will not be tolerated.

Supplementary Record Appendix, No. 94-1142, ("SRA") at p. 20.

McGuinness was given a sanction of six months in the prison's

Departmental Disciplinary Unit (DDU).3 According to the

affidavit of defendant Larry E. DuBois, the Commissioner of

the Massachusetts Department of Corrections (DOC), the DDU

has a maximum capacity of 121 inmates and is reserved for

violent inmates and/or those with severe disciplinary

problems. SRA at pp. 116-19.

 A.

 McGuinness filed a 1983 action against several prison

officials claiming that conditions in the DDU violated

provisions which grew out of state court litigation, Hoffer
 

v. Fair, Supreme Judicial Court, No. 85-71. Hoffer was a
 

class action challenging regulations pertaining to, and

conditions in, the prison's DSU. As we understand it, the

DSU is for administrative segregation and an inmate typically

is housed in the DSU because he is believed to pose a threat

 

3. According to the defendants, McGuinness served his six
month DDU sentence for the flushing incident from May to
November 1992. He was released from the unit, but upon being
found guilty of an assault, he received a second six month
term in the DDU and began serving this term in February 1993.
Presently, according to the defendants, McGuinness is serving
yet a third six month period in the DDU, as a result of
another assault. SRA at p. 128; Defendants' brief, Appeal
No. 94-1142, at p.2 n.1.

 -4-

to security.4 When that threat has dissipated, an inmate

ought to be released back into the general prison population.

The result of the Hoffer litigation was promulgation of
 

revised regulations, including those pertaining to the review

and release of an inmate after DSU placement. The revised

regulations provide for periodic hearings to review an

inmate's DSU classification and written guidance to an inmate

regarding what he might do to shorten his DSU term. See 103
 

CMR 421.15(2)(c); 103 CMR 421.19(2)(a) (effective 12/15/89).

The revised regulations also provide for an expanded range of

activities and privileges than previously permitted to DSU

inmates, such as access to educational and rehabilitative

programs. 103 CMR 421.21 (effective 12/15/89).

 While the Hoffer litigation was pending in the state
 

court, Commissioner DuBois instituted the DDU as a new unit

 

4. An inmate may be placed or retained
 in a DSU only after a finding by the
 Commissioner based on substantial
 evidence that, if confined in the general
 population of any state correctional
 facility:

 (1) The inmate poses a substantial
 threat to the safety of others; or

 (2) The inmate poses a substantial
 threat of damaging or destroying
 property; or

 (3) The inmate poses a substantial
 threat to the operation of a state
 correctional facility.

103 CMR 421.09 (effective 12/15/89).

 -5-

for disciplinary segregation.5 A sentence to a period of

confinement in the DDU is not subject to periodic review.

Inmates in the DDU are not provided access to educational

programs. McGuinness' 1983 suit charges that the new DDU

unit is merely the pre-Hoffer DSU by another name. He
 

claimed that the improvements in the conditions and programs

in the DSU brought about through the Hoffer litigation, in
 

particular, periodic classification review and access to

rehabilitative programs, are applicable to the DDU and that

the defendants have failed to provide him with those.

 Like the district court, however, we conclude that

summary judgment in favor of the defendants is warranted on

this claim. The record is clear that the DSU, which was the

subject of the Hoffer litigation, and the DDU are separate
 

units, used for distinct purposes. Apart from Commissioner

DuBois' affidavit, the defendants submitted a copy of an

April 1992 court order in the Hoffer litigation, in which the
 

state court declined to enjoin the Commissioner from

operating the DDU. It is true that the denial of the

injunction was without prejudice, in the event that the

Hoffer plaintiffs could further develop their factual claim
 

regarding the relationship between the DDU and the DSU. SRA

 

5. According to DuBois' affidavit, he directed that the
Department's regulations be amended on an emergency basis so
as to deal with what he viewed to be an emergency situation.
The amended regulations with respect to disciplinary
segregation went into effect on January 22, 1992.

 -6-

at pp. 122-23. McGuinness has presented nothing, however,

indicating that the Hoffer plaintiffs subsequently have been
 

successful in this claim.

 Moreover, McGuinness has not suggested why it is

unlawful, per se, to treat an inmate in administrative

segregation differently from an inmate in disciplinary

segregation. We need not, and therefore do not purport to,

determine whether the conditions in the DDU comply with the

Federal Constitution, but we note that the reasons provided

by the defendants for the distinct treatment appear

reasonably related to a legitimate penological interest. See
 

Turner v. Safley, 482 U.S. 78, 89 (1987) (announcing the
 

standard for determining the validity of prison regulations

which impinge on inmates' constitutional rights). A DDU term

punishes "the most dangerous and repetitive kind of conduct,"

while the "DSU remains a place to house and control inmates

who pose a danger to themselves or to others but for one

reason or another may not be amenable to punishment and for

whom the DDU would serve no penological purpose." DuBois

affidavit at p. 4.

 Because, presumably, an inmate in administrative

segregation may be entitled to release from that type of

segregation when the reasons for its implementation, for

example, a threat to security, have dissipated and his

behavior in the DSU warrants his release to the general

 -7-

population, it is reasonable to require that a DSU inmate

have the possibility of obtaining, and the means to obtain,

that release through periodic classification review hearing

and access to rehabilitative programs. By contrast, a DDU

inmate is being sanctioned for violent or severe disciplinary

problems by a fixed period of a more severe level of

incarceration. As there is no entitlement to early release

from the DDU, there would appear no need for the periodic

classification review hearing nor have we been pointed to

authority for the proposition that prison officials may not

sanction an inmate by withdrawing educational programs during

his placement in higher security.

 We further remark that the Hoffer court, itself, in
 

addressing the conditions in administrative segregation,

noted "the necessity of distinctions from the treatment of

those confined for disciplinary violations and those confined

solely for administrative reasons." Hoffer v. Fair, Supreme
 

Judicial Court, No. 85-71, Memorandum, Order and Judgment #17

(Sept. 19, 1989), SRA at p. 76. Suffice it to say that

summary judgment for the defendants was warranted on

McGuinness' claim that conditions in the DDU violated the

state court's rulings in the Hoffer litigation.
 

 B.

 McGuinness' second contention is that his access to the

law library or its materials, while confined to the DDU,

 -8-

fails to comply with a "stipulation of dismissal" entered

into in the Massachusetts federal district court case of

Cepulonis v. Fair, No. 78-3233-Z. The parties in Cepulonis
 

stipulated that the DOC would maintain a satellite law

library in the DSU with a designated list of particular

lawbooks. The stipulation also contained provisions for

requesting access to the satellite library, access to the

main prison library or to material available there but not in

the satellite library, and provisions regarding library

hours. The short answer is that the Cepulonis suit was a
 

class action concerning law library access of inmates housed

in the DSU. It did not speak to the DDU which, we recognize,
 

had not yet been created. But, by the same token, an alleged

failure to comply with the stipulation in Cepulonis (which
 

addresses the DSU) may be a questionable thread on which to

hang a claim regarding the contours of the entitlement of the

law library access in the DDU.

 The record indicates that an inmate in the DDU is

permitted a minimum of two hours access per week to a book

cart with a selection of starter volumes6; may request from

 

6. According to the affidavit of defendant Ronald T. Duval,
the Superintendent of MCI Cedar Junction, these include the
Federal Rules of Criminal Procedure, the Federal Rules of
Civil Procedure, the Local Rules of the U.S. District Court
for the District of Massachusetts, the Federal Practice
Digest on Prisons, Constitutional Law, and Criminal Law, the
Massachusetts Rules of Court, the Massachusetts Practice
volumes on Criminal Practice and Procedure and Criminal Law,
Massachusetts Criminal Law and Procedure, Cohen, How to Find
 

 -9-

the prison's law librarian any legal materials, up to six

items at one time, including legal research material in the

prison's main law library which is not available in the DDU,

which the inmate identifies, either by name or general topic;

and may retain loaned legal material in his cell provided

that it does not exceed the one cubic foot maximum level.7

We do not purport to resolve here (because it is not squarely

presented) whether these provisions for law library access

while in the DDU suffice to meet any constitutional threshold

for access to the courts.8 We conclude only that the

defendants were entitled to summary judgment on McGuinness'

claim that the provisions for law library access, while in

the DDU, violate the stipulation entered into in the

Cepulonis case regarding the DSU.
 

 

the Law, Gobert and Cohen, Rights of Prisoners, and Black's
 
Law Dictionary. SRA at p. 127.

7. According to Duval's affidavit, DDU inmates also have the
opportunity to retain and consult with outside, licensed
counsel, both in person and by telephone.

8. To succeed on a claim of denial of a constitutional right
of access to courts, a prisoner may be required to show an
"actual injury" to his ability to participate meaningfully in
the legal process, unless the deprivation is so significant
as to constitute an injury in and of itself. Sowell v. Vose,
 
941 F.2d 32, 34-35 (1st Cir. 1991) (per curiam). A challenge
to the basic adequacy of available materials may typify a
classic allegation of inherent prejudice, but not every
restriction on access to a prison law library is an
inherently injurious act. Id. at 34.
 

 -10-

 C.

 McGuinness' third claim was that 103 CMR 430.25(3)(d)9

which authorizes, as a disciplinary sanction, a sentence to

the DDU for a period of up to ten years impermissibly

conflicts with Mass. Gen. L. ch. 127, 40. That statute

reads:

 For the enforcement of discipline,
 an inmate in any correctional institution
 of the commonwealth may, at the
 discretion of its superintendent, be
 confined, for a period not to exceed
 fifteen days for any one offence, to an
 isolation unit.
 Such isolation units must provide
 light, ventilation and adequate sanitary
 facilities, may contain a minimum of
 furniture, and shall provide at least one
 full meal daily.

 

9. The applicable regulations regarding disciplinary
proceedings authorize the following sanctions for "major"
matters:
 (a) Isolation, for a specified period of
 time not to exceed 15 days for one
 offense, and no more than 30 days for all
 violations arising out of one incident.

 (b) Recommended good time forfeiture.

 (c) All minor sanctions.

 (d) Sentence to a Department
 Disciplinary Unit for a period not
 exceeding 10 years. An inmate shall be
 credited for time served on a monthly
 basis except when an inmate fails to
 attend his monthly review or is found
 guilty of a disciplinary offense.

103 CMR 430.25(3) (4/10/92).

 -11-

McGuinness' contention is that a sentence to the DDU is a

sentence to an isolation unit.

 The statute does not define an isolation unit beyond one

which must provide "light, ventilation and adequate sanitary

facilities, may contain a minimum of furniture, and shall

provide at least one full meal daily." Mass. Gen. L. ch.

127, 40. The prison regulations do not further define an

isolation unit.

 The record, however, evidences that the two are not the

same. The disciplinary proceeding regulations, themselves,

treat the two as distinct. The authorized sanctions for

commission of a disciplinary offense designated as a "major"

matter include isolation and/or a sentence to the DDU. See
 

 -12-

supra note 9.10 According to defendant Michael T. Maloney,
 

Deputy Commissioner of the Massachusetts DOC:

 The conditions in the DDU are not as
 severe as those that prevail in an
 "isolation unit" in the Massachusetts
 Department of Correction.
 An inmate in isolation is never
 allowed a television or radio. For
 fifteen days at a time, he is deprived of
 all out-of-cell activity and deprived of
 all outside contact or stimulus with the
 exception of a Bible or other holy book.
 By contrast, DDU inmates can
 communicate with other inmates one hour
 per day, five hours per week during their
 exercise periods. Pending good behavior,
 they can have telephone calls, visits and
 a television and radio.

SRA at pp. 124-25; see also SRA at p. 37.
 

 McGuinness counters by arguing that, at the very least,

the conditions imposed for the first 30 days of a DDU term

violate Mass. Gen. L. ch. 127, 40, which limits confinement

 

10. Those regulations further provide:

 The Superintendent shall designate
 such person or persons as he deems
 appropriate to review the status of
 inmates housed in isolation on a weekly
 basis. No inmate shall be retained in
 isolation continuously for more than 15
 days for any one violation. No more than
 30 days isolation shall be imposed on an
 inmate for all violations arising out of
 the same or substantially connected
 incident(s), unless specifically
 authorized by the Commissioner. No
 inmate shall, at any given time, be
 facing more than 30 days of closed solid
 door isolation time, unless specifically
 authorized by the Commissioner.

103 CMR 430.22(2) (4/10/92).

 -13-

to an isolation unit to "fifteen days for any one

offence."11 According to the DDU Orientation Manual, SRA

at pp. 28-40, for the first 30 days in the DDU, an inmate is

not allowed a radio, visitors, or access to a telephone.

These privileges may be earned after an inmate has completed

30 days free of disciplinary sanctions. SRA at p. 33. After

60 consecutive days of "disciplinary report free behavior," a

DDU inmate is permitted a television and additional visiting

and telephone periods. SRA at. 33-34. If, however, an

inmate engages in conduct resulting in disciplinary

 

11. Caselaw tells us that
 [b]y order of the [DOC] Commissioner, no
 more than thirty days of isolation may be
 imposed as a result of a single incident
 regardless of how many separate offenses
 were involved. [We note, for example,
 that, with respect to the "flushing"
 incident, McGuinness was found guilty of
 three separate prison offenses. See
 
 supra note 2.] Also by order of the
 Commissioner, at no time shall any inmate
 be facing accumulated isolation sanctions
 of more than thirty days even when
 numerous infractions have been committed.
 If two fifteen-day isolation sanctions
 are to be served, the inmate is removed
 from isolation for twenty-four hours
 between the two periods. During this
 twenty-four-hour break the solid door is
 left open and the inmate is accorded the
 privileges enjoyed by inmates not serving
 isolation time, including visits and
 exercise.

Libby v. Commissioner of Correction, 385 Mass. 421, 425
 
(1982).

 -14-

sanctions, he loses privileges and a new 30 day adjustment

period is begun. SRA at p. 33.

 Although these conditions may be "isolating," we do not

think the record supports the conclusion that the first 30

days of a DDU confinement is a confinement to an "isolation"

unit in violation of Mass. Gen. L. ch. 127, 40. A DDU

inmate, even during the initial 30 days of his DDU

confinement, has a one hour per day, five days per week, out-

of-cell exercise period during which he can communicate with

other inmates. SRA at p. 37; pp. 124-25. In contrast to an

inmate in an isolation unit, who is deprived of reading

material except for a Bible or other holy book, a DDU inmate

is permitted four personal or library paperback books,

newspapers or magazines in any combination. Two books may be

borrowed from the library cart at any one time. SRA at p.

37. A DDU inmate is permitted access to the "DDU [Legal]

Research Area," whereas an inmate in isolation "will not

normally be allowed Research Area access." SRA at p. 38-40.

The district court did not err in granting summary judgment

to the defendants on McGuinness' claim that a sentence to the

DDU is a sentence to an isolation unit.

 III.

 The order of the district court granting summary

judgment in favor of the defendants is affirmed.
 

 -15-