Barrett, J.
The court has before it motions to dismiss in the above captioned case and in the fourteen companion cases. With respect to the defendants, James Clark, Tony Gaskins, Lance Hullum, Timothy Bloom, Dana Carle and Casper Forte, the motion is based on the contention that the placement of these defendants in the Cedar Junction Departmental Disciplinary Unit (DDU), amounts to double jeopardy which would mandate the dismissal of the indictments in the present cases. The remaining eight cases[2] also challenge the incarceration of the named defendants in the DDU, contending that it constitutes cruel and unusual punishment and is violative of due process of law. This court conducted evidentiary hearings over a period of eight days and took an extensive view of the DDU. It has considered the evidence presented, has made findings set out hereafter in this memorandum, considered the arguments of counsel on behalf of the defendants and denies all motions.
The double jeopardy issue arising out of confinement of the inmates to the DDU has already been before the Supreme Judicial Court in the case of Commonwealth v. Forte, 423 Mass. 672 (1996). The SJC, citing a series of federal cases, noted in Forte that “the Federal double jeopardy clause may have no application to prison discipline and a criminal prosecution based on the same facts.” Id. at 674. The basis for this is that “discipline imposed on an inmate for misconduct in prison fairly may be viewed as a change in the conditions of his confinement for the crime or crimes that placed him in prison in the first place.” [Citations omitted.) The SJC stated “[ojpinions of the United States Courts of Appeals have unanimously agreed that the double jeopardy clause does not preclude both prison discipline and a criminal prosecution (and a further sentence) based on the same acts." [Citations omitted.) The court further stated:
[t]he reasoning of these opinions, with which we agree, is that prison authorities have a right to make changes in the conditions of a wrongdoer’s confinement in order to maintain institutional security and order; that prompt discipline within the penal system brings home to the wrongdoer and other inmates the importance of good conduct; and there is no reason why the State must make a choice between criminal punishment and institutional discipline. In the choice of discipline, the courts have deferred to prison authorities on what discipline is necessary and proper to preserve order and encourage good conduct. Commonwealth v. Forte, supra at 676.
The SJC further noted that the imposition of prison discipline is a civil proceeding. It noted that the DDU has a punitive aspect but that it also serves the deterrent purpose of demonstrating to all other inmates that good behavior is expected of them and if they do not conform to prison rules, there will be adverse consequences. The court stated that “on the clearest proof, a civil penalty might be shown to be so extreme in purpose or effect as to be equivalent to a criminal proceeding and the penalty, therefore, subject to the double jeopardy clause.” Id. at 677. The court further observed that, on the record before it, *98 the lower court judge did not explicitly consider the question of whether the penalty imposed on any defendant was so extreme in purpose or effect as to be the equivalent of a criminal penalty. The standard by which these present motions are to be governed, therefore, was stated by the SJC, namely, that in order to carry the day, the defendants must show “on the clearest proof [that] the penalty imposed on any defendant was so extreme in purpose or effect as to be equivalent to a criminal penalty.” This court, therefore, has confronted this task described by the Supreme Judicial Court.
The Supreme Court of the United States since the decision in Commonwealth v. Forte, has reviewed, once more, the double jeopardy clause of the Constitution in Hudson v. United States, No. 0/0-976, 1997 U.S. Lexis 7497, (December 10, 1997). In that decision, the Supreme Court renewed and reenforced the method of analysis to determine whether double jeopardy has been incurred by the imposition of penalty which was stated initially in the case of Kennedy v. MendozaMarttnez, 372 U.S. 144, 168-69(1963), as follows:
1) whether the sanction involves an affirmative disability or restraint; 2) whether it has historically been regarded as a punishment; 3) whether it comes into play only on a finding of scienter; 4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; 5) whether the behavior to which it applies is already a crime; 6) whether the alternative purpose to which it may rationally be connected is assignable for it and; 7) whether it appears excessive in relation to the alternative purpose assigned. Hudson v. United States, supra at 12.
The court noted that these factors must be considered in relation to the statute there in issue and only, on the clearest proof, will a statute imposing a civil penalty or a civil remedy be transformed into a criminal penalty. The substance, then, of the holding of the Supreme Court in Hudson is that where a civil penalty is imposed upon an individual the analysis must include these seven guideposts. Id. It is to be noted, however, that the Hudson case was not concerned with the issue of whether double jeopardy applies in prison circumstances. The holding of the Hudson case is that in order to meet the standard of the clearest proof that the penalty is so extreme in purpose or effect as to be the equivalent of a criminal proceeding is based on the seven step analysis described in the opinion. The Hudson case involved the application of a statute rather than prison discipline so that some of the guideposts do not fit the present inquiry.
Some of the defendants have asserted as a basis for their motion to dismiss that confinement in the DDU constitutes cruel and unusual punishment in violation of both Federal and State Constitutions. Incarceration itself constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article 26 to the Massachusetts Declaration of Rights when conditions of confinement pose a substantial risk of harm to inmates, and prison authorities are deliberately indifferent to that risk. Good v. Comm’r of Correction, 417 Mass. 329, 335-37 (1994). Ihe Eighth Amendment which applies to the state through the due process clause of the Fourteenth Amendment, prohibits the infliction of “cruel and unusual punishments” on those convicted of crimes. Wilson v. Seiter, 111 S.Ct. 2321, 2323 (1991). However, only the “unnecessary and wanton infliction of pain implicates the 8th Amendment. Id. at 2323.
Article 26 of the Declaration of Rights prohibits the infliction of cruel and unusual punishment. The SJC has read Article 26 to be at least as broad as the Eighth Amendment to the U.S. Constitution. Michaud v. Sheriff of Essex County, 390 Mass. 523, 534 (1983). Article 26 bars punishments which are found to be cruel or unusual in light of contemporary standards of decency which mark the progress of society. Libby v. Comm’r. of Correction, 385 Mass. 421, 435 (1982). See Good v. Comm’r. of Correction, supra at 335.
Where the complaint in part, at least, is that appropriate care for a prisoner was not provided by prison authorities, the issue involves proof by the complainant of a subjective element on the part of the prison authorities, namely, deliberate indifference to the needs of the prisoner and an objective aspect; namely, unreasonable risk of serious damage to the health of the prisoner. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Wilson v. Seiter, 111 S.Ct. 2323, 2327 (1991).
Some of the defendants have also asserted, as grounds for their motions, unlawful use of excessive force by prison authorities in the DDU, particularly with reference to move team operations where an inmate is removed from his cell and placed in another cell. The Supreme Court in Whitley v. Albers, 475 U.S. 312, 321-22 (1986), stated the following:
prisoner administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citation omitted.] That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incident of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.
To carry the day, the defendant must show that the measures taken by the prison authorities inflicted unnecessary and wanton pain and suffering on the inmate which, in turn, ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for *99 the very purpose of causing harm. Again, there is both a subjective and objective aspect to the inquiry; namely, whether the prison authority had a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. Hudson v. MacMillan, 503 U.S. 1, 8 (1992).
This concludes, however briefly, a recitation of the applicable law involved here. I now turn to specific findings of fact based on the evidence before me, the view taken and all inferences to be appropriately drawn therefrom.
FINDINGS OF FACT
I make the following findings:
1. The DDU opened in April 1992 to house inmates who had been found guilty of committing major disciplinary violations at MCI-Cedar Junction and to provide a restrictive environment for those individuals. A procedure was set in place to assure that only those individuals who had committed a major violation of prison discipline would be sent to the DDU. The procedure under which one is determined to be guilty of a major disciplinary infraction has not been challenged in the motions before the court and, consequently, I make no findings with respect to that procedure. I do note, however, that, for the most part, the disciplinary infraction has to be of a serious nature and often implicates violent conduct. By way of illustration of this, the defendant, Gaskins, is charged with assaulting a correction officer and the defendant, Bloom, is charged with first degree murder involving the killing of a fellow inmate. I also note that while an inmate may be sentenced for as long as ten years in the DDU, the DDU sentence cannot exceed the period for which that inmate was originally incarcerated. I also note that there is no reduction in the time to be served in DDU for good behavior.
2. The DDU is a modem, secure facility. It has the capacity to house 124 male inmates in individual cells. It has three wings; each wing has four tiers; and each tier has ten or eleven cells and one shower.
3. Each cell is approximately 7’ x 12’. Each has a toilet, a sink, a bed, a desk with a concrete seat attached to the floor and a 5 W x 571/2" window at the rear of the cell. Each cell is illuminated by two 40 watt, 4’ fluorescent lights. Each cell has a 13 watt night light. The described window provides an opportunity to view the sky and admits significant light into the cell.
4. The walls of each cell are concrete. The cells are spacious in appearance. They are clean and painted in a light color which enhances the bright and clean atmosphere.
5. There is a small gap between the floor and the bottom of the door to each cell. Each cell door is solid steel with a window with dimensions of 4" x 26". Each door has a horizontal opening of approximately 23" in length, located 4V2’ above the floor. Each door also has a second opening lower in the door. The upper opening is used to serve food to the inmates and to handcuff them when they are removed from the cells. The lower opening provides access to the inmates’ ankles so that they may be shackled. The inmates are shackled and handcuffed any time they leave their cells and are escorted on a hands-on basis by a correction officer.
6. Cells do not face each other. The toilets in the cells are noisy. Additional noise is caused by the closing of the heavy doors to each of the tiers.
7. Conversation between inmates while in their cells is possible but difficult due to the configuration of the cell doors and echoing in the tier area. The window in the cell door also provides light and a spacious effect to the cell. I note, however, that neither window in the cell may be opened by the inmate.
8. The inmate is provided with cleaning equipment and is required to clean his cell. The cells in the DDU are clean, neat and uncluttered.
9. The defendant complains that it is noisy with the slamming of the tier doors by the correction officers (c.o.) and others making rounds. The tier doors are heavy, with a large and complex appearing locking mechanism. I find that, although noisy, the use of such doors and locking mechanisms is appropriate and necessary for the security and operational needs of the DDU.
10. The defendants also complain about the temperature and air circulation in the cells. The view of the DDU disclosed that air circulation is low, but the temperature is comfortable. I find that whenever there was a serious problem with the air circulation system, appropriate action was taken and that air circulation did not have a detrimental impact on the inmates. I find that, while less than perfect, the heating, air conditioning and ventilating system in the cells is reasonable. It does not adversely affect the inmates’ health or welfare.
11. The defendants complain about the nature of the clothing issued to them. They complain that it is lightweight clothing and that they are required to use it year-round, although they are provided with a winter coat and a watchcap which they retain throughout the year. They also complain about the fact that there is a lightweight slipper-type footwear issued to them. I find that such footwear is issued in order to avoid providing these inmates with footwear that could be used as a weapon against the c.o. I also find that the clothing issued to the inmates is appropriate and proper and does not impair their health or welfare.
12. There are three exercise yards attached to the DDU, each of which contains seven separately fenced exercise areas. Each area is approximately 7’ x 35’ x 10’, and is covered with a chainlink fence on the top and on all sides. In addition, some but not all of the exercise areas had a net covering over them and around them. Recreational equipment is not provided. The inmates are allowed one hour on each weekday where they can exercise, if they choose to, in these exercise yards. The exercise yards are located outside, and thus, open to inclement weather and snow and *100 slush during the winter months. The defendants complain that the net covering is oppressive and prevent a view of the sky and outside areas. The view of the DDU revealed that the net areas do not block the view of the sky by the inmates and it permits ready viewing of the areas outside of the exercise yards. I find that the purpose of the netting is to prevent escapes by the inmates. The exercise areas are adjacent to each other and permit inmates, in the course of their exercise or otherwise, to converse on a face-to-face basis with each other. The DDU does not permit any group exercises or sports events. On the whole, I find that the exercise areas are not oppressive, that they do not interfere with the health or welfare of the inmates and, under the necessary restrictive conditions of the DDU, are appropriate for its efficient operation.
13. The DDU has approximately 13 multipurpose rooms, some of which are used for mental health counseling or other counseling. It has health services rooms. I viewed both the dental facility and the medical room and note that each appears to be appropriately equipped.
14. There was also significant evidence regarding the presence in the tiers of certain observation cells where, according to the prison authorities, prisoners who were difficult to control or had incurred certain disciplinary infractions at DDU would be placed.
15. The defendants complain about the quality and quantity of food served to them and assert that, while at the DDU, they lost substantial body weight. I find that the food provided to the inmates was the same food provided to the general prison population with double portions of bread and vegetables. I find that the portions of food provided to the DDU inmates are measured portions of the same quality and quantity (except for double portions of bread and vegetables) provided to the general inmate population and that these portions meet the dietaiy requirements of USDA daily caloric requirements. In addition, the diet is designed to be appropriately low fat and low cholesterol in nature. The defendants also complain regarding the food being too cold. I find that hot carts were used to transport food from the kitchen to the DDU at appropriate temperatures. The carts were plugged into electrical sources upon arrival at the DDU. There is no doubt that there may have been instances where the food was not as hot as these defendants would like; nonetheless, the food was of wholesome quality. The prison authorities took appropriate action to correct problems with the warmth of food when a problem was encountered.
16. The defendants also complain of dishwater or other water in the trays in which the food is served. I viewed the kitchen and observed that the trays are put through a commercial type dishwasher after use and then are air dried. This left some water on the trays. There was evidence as well that some trays are used that have not been sufficiently air dried. There is no doubt that some of the water is from condensation from heated food. The bread is bagged to prevent sogginess. In the course of the view, I observed some of the trays had a film or a thin coating which appeared to be some type of soap remnant. This certainly indicates that improvements are needed, including an improved cleaning and drying system to assure that the film of soap material and the water are removed from the trays. I find, however, that notwithstanding these matters, the food served to the defendants is wholesome and in suitable quantity. I find also that the prison authorities take correct follow-up measures to ensure that the food is sufficiently heated and wholesome. The defendants also complain about the quality and amount of food they receive and that they are not permitted to buy food at the canteen to supplement their diet. The findings previously made regarding the quantity and quality of food served to them adequately resolves this issue.
17. The defendants also complain about food service during exercise periods while they are away from their cells. This is a necessary aspect of the prisoners’ regulated hours. Food trays have to be recovered soon after the food is delivered to the cells because these trays could be used as weapons. Again, this is an appropriate operational requirement imposed because most of the inmates assigned to the DDU are there because of violent breaches of prison discipline.
18. The defendants complain about the water. They describe the water as green in color. They express concern that the water is not pure and that it might cause them illness. I observed during the view a slight green stain on the shower walls and a slight green deposit on the sink in one or more cells. Inotedalso, uponmyretum to the courthouse, a similar green stain on the sink in the courtroom lobby. The Commonwealth witness explained that this is due to the mineral content of the water and that it does not impose any health risk to the defendants. I find that the water poses no health or welfare risk to the defendants.
19. The defendants complain of security measures used in the DDU. They complain of the strip searches used on a random basis when the prisoners leave their cells for exercise or otherwise. They complain of pat-down searches used by the correctional officers. They complain of cell searches which are made when the inmates are out of their cells. They complain about the handcuffs and leg shackles used when the inmates are taken from their cells and they complain about the correctional officers using a hands-on approach when the inmate is outside of his cell. I find that these are not inappropriate security precautions given the fact that many of these inmates have previously demonstrated violent behavior. The use of such methods is certainly within the range of security procedures appropriately entrusted to prison authorities.
20. The defendants also complain about the movement of prisoners, from time to time, from one cell to another cell. The Commonwealth explains that these moves are used for security purposes and that they do not use either chemical agents or force to remove an *101 inmate from his cell unless he refuses to be moved. The evidence, which I accept as true, is that the inmates are first asked to leave their cell and force or chemical agents are used only if the inmate refuses to leave his cell in a peaceful manner. I find that the purpose of the moves and means used by the prison authorities is within the discretion granted to them in the administration of the institution. These means do not impose undue hardship or punishment on the inmates. I also find, in accordance with the evidence, that where a chemical agent is required to be used to remove an inmate from a cell, the prison nurse visits all the nearby inmates as soon as possible and within thirty minutes after the event. I find that inmates in the area of the removal are not unduly affected by the chemical agent used. In addition, I find that the authorities use all appropriate measures to remove the chemical agent from the cell and the tier as soon as possible.
21. The defendants also complain about the nature of the medical treatment available to them at the DDU. Numerous complaints were made about delays in obtaining headache medicine or other medication. They complain about the absence of any skin lotion or other material to aid them in their problems with dry skin. They complain about absence of dental care. I find that there are nurse attendants at the DDU for sixteen hours each day. I also find that during the other eight hours there is a nurse or nurse practitioner available at Cedar Junction who can visit the DDU and deal with any problems which may arise. I find that the nurse on duty makes four rounds per day, and on at least one of these visits, contacts each inmate, providing an opportunity for that inmate to describe any medical problems that he might have to the nurse. The procedure for any inmate who has a medical problem is to fill out a medical slip obtained from the nurse on rounds, and the nurse then evaluates the medical problem and, if necessary, the inmate is removed from his cell and brought to the medical room where the inmate is seen by the nurse and, depending on the nature of the problem, either the nurse will provide medications to the inmate, or will refer the inmate to the nurse practitioner or doctor who will be available to deal with the medical problem. There is a procedure for emergencies where immediate assistance is necessary. A doctor visits the DDU twice a week to treat inmates. A dentist visits the DDU weekly to treat inmates. The doctor is available on call for emergencies. Medical specialists are also available as needed. I find that the médical treatment provided to the defendants is adequate under the circumstances.
22. The defendants also complain regarding visiting and the absence of any contact with any visitors, that the visits must be scheduled twenty-four hours in advance by individuals and there is a limited list of visitors which can only be changed every six months. I find, however, that the process for visiting is appropriate and that for the entire Cedar Junction prison population there is a policy of no contact visits. I find that the process for arranging for a visit twenty-four hours earlier and cancellation of the visit if more than one-half hour late is not inappropriate. I find that, in general, the visiting protocol for the DDU inmates is appropriate. I find, however, that one of the defendant’s complaints is warranted; namely, that the telephone cord provided to the visitor is not of sufficient length to permit a wheelchair encumbered visitor to use the telephone comfortably. This is a matter which ought to be attended to but is certainly not a problem of constitutional proportions.
23. The defendants also complain that they are not given appropriate and prompt access to legal materials. I find that there is in each wing of the DDU a book cart which contains approximately thirty-seven legal volumes. If an inmate wants additional material, he has to send to the main prison library for a copy and this is done by submitting a request form. The prisoner also has use of one of the rooms in the DDU for working with the supplied references. I find that, given the circumstances, there is appropriate access to legal materials.
24. An inmate may keep in his cell up to ten personal or library books or newspapers or magazines. In addition the inmate is permitted to have up to ten personal letters or cards and twelve photographs.
25. After thirty consecutive days of disciplinary report free behavior, a DDU inmate is provided with a radio, complete with earphones. This radio would be retained as long as the inmate remained disciplinary report free.
26. After sixty consecutive days of disciplinary report free behavior, each inmate is issued a state owned television for use during that period in which he is confined in the DDU. If the inmate later receives a disciplinary report, he would lose the television set and be eligible to obtain a television set only upon completion of another sixty-day disciplinary report free period.
27. A DDU inmate may not participate in programs or correspondence courses or programs other than a GED course of study which is made available on the television set.
28. DDU inmates earn visiting privileges by remaining disciplinary report free for thirty consecutive days and attending the required monthly review in order to have one visitor for the following month. Additional visiting periods, up to four, are received for each additional thirty days free of disciplinary reports. This privilege also may be lost by a finding of a major disciplinary report. Social visits are restricted to four adults who, as noted earlier, are required to be listed by the inmate and approved by the superintendent with changes in the list on a six month basis. No more than two adults may visit at one time with children under the age of fourteen.
29. Attorney visits are required to be in accordance with 103 C.M.R. 486. There was no evidence of any impairment of the right to visits by attorneys.
*102 30. Inmates earn telephone privileges by remaining disciplinary report-free for thirty consecutive days and for each such additional thirty consecutive day period, the inmate earns an additional telephone call with a limit of four per month. This privilege is subject to the same loss provision described for the radio and television sets. Attorney telephone calls, in addition to the aforementioned scheduled calls, can be made on an emergency basis by the attorney to the inmate.
31. It should be noted that in the event of a guilty finding on a major disciplinary report, an inmate will lose the privileges previously described in paragraphs 25 to 30 and also loses the inclusion of the month in which the infraction occurred in the calculation of his release date from the DDU.
32. The procedure at DDU for mental health evaluations is that, upon admission, each inmate undergoes a mental evaluation. This is followed by another evaluation thirty days later and thereafter, on the expiration of each ninety day period, a further evaluation is made. There are weekly rounds by a mental health provider during which the inmate may either address the provider from inside his cell through the door or, if he desires a private consultation, may request it. In this case, the inmate will be taken out of his cell and will have a private consultation with the mental health provider. The mental health providers are part of the staff of the entire institution and not a separate unit for the DDU. These providers are on duty twenty-four hours daily and are on call as needed. The defendants contend that this is not adequate and that the rounds and various interviews referred to above are not carried out. I do not credit the statements of the defendants in this regard. I find that the provision of mental health care by the institution is adequate.
33. The defendants also challenge the level of religious counseling provided to them while in the DDU. I find that a religious staff member makes a round of each cell once per week and, at that time, either the inmate can address the staff person through the door or request a private consultation which will be granted by removing the inmate from his cell and placing him in a private room with the religious counselor. The defendants complain that they are not permitted a group religious meeting nor to attend group services. One of the administrative policies of the DDU is to keep inmates segregated from each other in order to prevent them from inflicting violence on other inmates and correctional personnel. Consequently, I find the religious counseling available to the inmates, under the circumstances of their confinement in the DDU, is appropriate.
34. The defendants assert that the totality of confinement in the DDU imposed upon the inmates causes severe psychiatric reaction. They provided the testimony of Dr. Stewart Grassian, whose testimony essentially was that confinement in the DDU causes restrictive environment syndrome in the prisoners. Dr. Grassian, who is also a member of the Bar, described his studies of inmates under solitary confinement conditions, touching upon nearly all aspects of confinement, including the color of the paint in the cells, and the size of the windows in the cells. He expressed concern with the lack of physical contact by the prisoners, lack of the ability to make telephone calls in what he considered sufficient volume, access to the canteen, and many aspects of confinement. Dr. Grassian has, over the years, been a severe critic of what he described as solitary confinement or the type of confinement provided by the various so-called “supermax” prison facilities. Dr. Grassian described various inmates whose histories he studied and who suffered psychiatric or psychological impairment while in the DDU or elsewhere in similarly structured institutions. There can be little doubt that someone who is psychologically impaired when he enters the DDU is at risk of an exacerbation of that impairment. It also seems clear that anyone who is psychologically impaired will be effected to a greater or lesser degree by stressful circumstances, including placement in the general population of any penal institution. Dr. Grassian’s opinion is that the lack of stimulation occasioned by what he incorrectly describes as “solitary confinement," enhances the psychological effect of the DDU on the inmates confined therein. He urges such stimulation as occupational training or therapy — through television, contact visits, group recreation, except where the inmate is assaultive, and other measures that would tend to stimulate the inmate, including large cell windows that are subject to being opened by the inmate, different exercise facilities, etc. In short, Dr. Grassien quarrels with the basic premise underlying the DDU which is that the inmates confined there are major violators of prison disciplinary regulations and need to be isolated so that they can no longer wreak havoc on the administration of the prison and punished so that neither they nor other inmates who are aware of the punishment will violate prison discipline. The Commonwealth’s response to this testimony was chiefly through the testimony of Richard Vinacco, a licensed psychologist holding a doctorate in that profession. He serves as regional director of mental health for a number of institutions, including Cedar Junction. He described the mental health protocol for the DDU and the resources available to the inmates. Dr. Vinacco opined that confinement such as that in DDU does not cause adverse psychological effects based on his professional experience with prisoner inmates over the years.
I find the psychological and mental health procedures which are made available to the inmates, while they can undoubtedly be improved, are adequate to provide an appropriate level of mental health care to the inmates at the DDU so that an inmate will not be subjected to a serious risk of psychological harm by being confined in that facility.
35.There were additional complaints by the defendants relative to the DDU which were minor in nature and are not of significance or consequence to this decision.
*103 36. Based on the evidence before me, I find that the purpose of the DDU is to enhance the administration of MCI-Cedar Junction. It is a means to deal with prisoners who have seriously violated prison discipline, either through violence or otherwise, and whose continued presence in the general prison population, if permitted, will continue to seriously threaten the orderly administration of the facility. The harsh conditions imposed on the inmates at DDU clearly have an element of punishment to them, as well as an element of deterrence to them. I find that these conditions are appropriate and, indeed, perhaps even necessary, to impress upon the transgressors and other inmates that serious violations of prison discipline will not be tolerated and that there will be a serious price to be paid should such a violation be undertaken. I find that the DDU and the means and the procedures used within the DDU are within the range of appropriate discretion vested in prison authorities to operate the prison facility in a firm but wholly appropriate fashion.
DISCUSSION DOUBLE JEOPARDY
The issue that ought to be resolved once and for all is whether the double jeopardy clause applies to prison discipline and a criminal prosecution based on the same facts. The Supreme Judicial Court addressed this issue in Commonwealth v. Forte, 423 Mass. 672, 674-76 (1996). The SJC referred to a line of federal cases which unanimously decided that the double jeopardy clause does not apply to prison discipline. As the SJC noted, “The reasoning of these opinions, with which we agree, is that prison authorities have a right to make changes in the conditions of a wrongdoer’s confinement in order to maintain institutional securiiy and order; that prompt discipline within the penal system brings home to the wrongdoer and other inmates the importance of good conduct and that there is no reason why the state must make a choice between criminal punishment and institutional discipline. In the choice of discipline, the courts have deferred to prison authorities on what discipline is necessary and proper to preserve order and encourage good conduct (citations omitted).” Id. at 676. This court has found that the conditions imposed by the prison authorities in the DDU are necessary and proper for the orderly administration of the institution. It is likely, however, that prison discipline in the DDU and elsewhere will be repeatedly raised as violative of the double jeopardy clause unless this issue is squarely confronted and determined. This court therefore rules that the double jeopardy clause does not apply to prison discipline.
In the event that this ruling is not the law of this Commonwealth, I determine that the defendants have not carried their burden of proving on the clearest proof that the conditions in the DDU are so extreme in purpose or effect as to be equivalent to a criminal penally. Commonwealth v. Forte, supra, at 677-78. I refer to the findings heretofore made by me regarding the conditions of confinement within the DDU. These conditions are appropriate and perhaps even necessary in many instances to deal with the issue of serious infractions of prison discipline, including violent behavior. None of the conditions complained of are so extreme, either individually or considered collectively, in either purpose or effect, to be equivalent of a criminal penalty. All of the conditions complained of were appropriately imposed within the discretion granted to the prison authorities to effectively administer a prison institution. Undoubtedly, there can be improvements in conditions that would lighten the burden of confinement in DDU imposed on the defendants, butnone of these conditions, relatively minor in nature, would cause confinement in the DDU to cross the line into the equivalent of a criminal penalty. I note that the length of confinement to which a defendant was sentenced cannot be enlarged in length because of confinement in the DDU. The wrap up date for a defendant would be the same whether in general population or in the DDU. To sum up: the defendants have failed to demonstrate ... on the clearest proof.. . “that their placement in the DDU was so extreme in purpose of effect as to be the equivalent of a criminal penally. ”
The court has also considered the seven guideposts set out by the Supreme Court of the United States in Hudson v. United States, 96-976, 1997 U. S. Lexis 7497, (Dec. 10, 1997). Most of these guideposts or criteria do not, by their terms or meaning, apply to the situation in the present litigation, since the Hudson case dealt with a statutorily imposed monetary penalty and occupational debarment for violation of 12 U.S.C., §§84(a)(l) and 375b and 12 CFR @@ 31.2(b) and 215.4(b) which are federal banking statutes or regulations. The guideposts are statutorily or regulatorily focused so that they apply at best indirectly or not at all to the prison discipline issue presently before this court and perhaps illustrate the inapplicability of the double jeopardy clause to prison discipline. The Supreme Court in Hudson takes note initially of whether the penalty under analysis was imposed as a civil matter. The Supreme Judicial Court described DDU confinement as a civil proceeding in Commonwealth v. Forte, supra at 676. Confinement in the DDU is a change in the method of imprisoning the defendant, but it does not add any additional term to the sentence being served by him. Confinement in the DDU, in addition to a higher level of security, has an aspect of punishment and deterrence to strongly impress the inmate confined in the DDU and all other inmates of the need to avoid serious prison disciplinary infractions.
The third guidepost of scienter does not seem applicable to the present situation although the advancement of the double jeopardy claim is made in cases where serious criminal changes are made.
As to the fourth guidepost, there is clearly an alternate purpose for which DDU confinements are made, not only to punish and deter both the individual *104 involved and other inmates, but also to remove the defendant from access to other inmates and correction personnel thereby eliminating the opportunity for violent conduct.
As to guideposts five, six and seven, the acts of the defendants which caused their assignment to the DDU are the bases for criminal charges against them but the evidence in this proceeding did not disclose whether every violation by an inmate of prison discipline resulting in DDU confinement had to be a criminal act. As previously noted, the primary purpose of confinement to the DDU is to enforce prison discipline, thus facilitating the orderly and efficient administration of the institution. As the SJC stated in Commonwealth v. Forte, 423 Mass. 672, 677 (1966), “. . . confinement to the DDU has a remedial purpose." Finally, again as noted, confinement to the DDU is not excessive in relation to the alternate purpose for its existence.
Some of the moving parties in this case have asserted, as the basis for their motion to dismiss, that confinement in the DDU constitutes cruel and unusual punishment in violation of both state and federal constitutions. As noted earlier in this decision, in order to prevail on this issue, the complainant must prove a subjective element on the part of the prison authorities to impose deliberately cruel and unusual punishment on the complainant or a deliberate indifference to the needs of the prisoner and, as well, an objective aspect; i.e., unreasonable risk of serious injury or damage to the health of the prisoner. The findings heretofore made dispose of this issue. This court rules that the complainants have failed in all aspects of their proof in this regard. The program set up by the prison authorities for the care of the prisoners confined in the DDU is an appropriate exercise of their discretion in the administration of the institution and does not inflict cruel and unusual punishment upon these prisoners. There is no unnecessary and wanton infliction of pain on these complainants. In addition, in instances where the prison system or facilities maintenance has failed in the DDU, the authorities have moved promptly and effectively to cure whatever problem existed such as failure of the air conditioning system or the food not being served at a sufficiently warm temperature.
There was no credible showing of deliberate indifference on the part of prison authorities to the needs of the defendants. Moreover, no unreasonable risk of serious injuries to the physical or mental health of the complainants was adequately demonstrated by the defendants.
To the extent that it has not already been covered, there was no unlawful use of excessive force by prison authorities. The movement of a prisoner from one cell to another cell was undertaken by the prison authorities for the purpose of a good faith effort to avoid the prisoner secreting contraband in his cell, and the force that was applied, where necessary after persuasion failed, was not beyond the scope reasonably necessary for the purposes of safely moving the inmate from the cell and was not applied in a malicious or sadistic manner for purpose of punishing that inmate. Prison authorities often have to deal with the events before them under great pressure and emotion and are properly vested with a range of reasonable discretion in which they may apply reasonable force in a good faith effort to accomplish the purpose of maintaining institutional security. This court finds the processes and the procedures well within the discretion granted to the administration. In conclusion, the claim of cruel and unusual punishment has not been proven.
The last issue here is the contention by the Commonwealth that the trial of the various criminal charges against the defendants should not be stayed during an expected appeal from the decision of this court on these motions to dismiss. The Commonwealth has pointed out that, at least with respect to the defendants Clark, Gaskins, Hullum, Bloom, Carle and Forte, that these cases have been pending for a long period and that they have already gone through the process of one appeal on this issue. They are now engaged in the precursor of a second appeal. The Commonwealth acknowledges, as it must, that there is a presumptive right of interlocutory appeal to resolve double jeopardy claims prior to trial. If the claim were successful on appeal, it could not adequately be remedied after trial and conviction. McGuiness v. Commonwealth, 424 Mass. 1004, 1009 (1997). The Commonwealth presses upon the court the solution that the federal circuits have developed to prevent dilatory appeals in double jeopardy cases. This procedure permits the trial to proceed during an interlocutory appeal despite the denial of the double jeopardy claim if the lower court judge finds that claim frivolous and makes written findings. U.S. v. Millan, 4 F.3d 1038, 1044 (2nd Cir. 1993), cert. den., 114 S.Ct. 1375 (1994); U.S. v. Leppo, 634 F.2d 101, 105(3rd Cir. 1980); U.S. v.Head 697 F.2d 1200, 1204, n.4 (4th Cir. 1982) cert. den., 462 U.S. 1132 (1983); U.S. v. Patterson, 809 F.2d 244, 247 (5th Cir. 1987); U.S. v. Land, 669 F.2d 391, 394 (6th Cir. 1982), cert. den., 457 U.S. 1134 (1982); U.S. v. Powers, 978 F.2d 354, 358 (7th Cir. 1992), cert. den., 507 U.S. 935 (1993); U.S. v. Brown, 926 F.2d 779, 781 (8th Cir. 1991); U.S. v. LaMere, 951 F.2d 1106, 1108 (9th Cir. 1991); U.S. v. Hines, 689 F.2d 934, 937 (10th Cir. 1982); U.S. v. Farmer, 923 F.2d 1557, 1565 (11th Cir. 1991).
In accordance with the procedures set out in these federal cases, this court determines that the double jeopardy claim here is frivolous. This claim is clearly lacking in merit for the reasons heretofore stated and is not worthy of expedited appellate review at the expense of further delay in the trial of these matters. Obviously, the longer the defendants can ward off confrontation of the criminal charges against them, the better off they are in terms of evidence degradation.
RULINGS
In light of the foregoing decision, the court ORDERS the motions to dismiss of the defendants herein be DENIED.

I assume that Casper Forte is raising all of the issues asserted in all of the motions before the court.