NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10944

COMMONWEALTH  vs.  RYAN JONES.


        Bristol.     November 10, 2017. - February 20, 2018.

     Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Mental Impairment.  Developmentally Disabled Person.
     Constitutional Law, Sentence, Cruel and unusual punishment.
     Practice, Criminal, Competency to stand trial, Sentence.



     Indictment found and returned in the Superior Court
Department on August 17, 2006.

     A hearing on the defendant's competency to stand trial was
held before D. Lloyd Macdonald, J., and the case was tried
before Gary A. Nickerson, J.


     Brett J. Vottero for the defendant.
     Shoshana E. Stern, Assistant District Attorney, for the
Commonwealth.


     GAZIANO, J.  A Superior Court jury found the defendant

guilty of murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty in the death of

Valerie Oransky on July 22, 2006.  Prior to and during trial,

the defendant maintained that he was not competent to stand

trial due to an organic brain injury he had suffered as an infant and a current diagnosis of pervasive developmental disorder not otherwise specified.  The defendant was the subject of competency hearings before five different Superior Court judges, and was found competent to stand trial at the first, third, fourth, and fifth hearings.  At trial, his defense was that he was not criminally responsible.

On appeal, the defendant argues that the judge who conducted his third competency hearing erred in finding him competent to stand trial notwithstanding testimony from both prosecution and defense experts that the defendant was not competent.  He also argues that a mandatory sentence of life in prison without the possibility of parole, imposed on a developmentally disabled individual, constitutes cruel and unusual punishment in violation of Federal and State constitutional rights.  Finally, the defendant asks us to use our extraordinary power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict.  For the reasons that follow, we affirm the conviction and decline to exercise our authority to grant relief under G. L. c. 278, § 33E.

1. Procedural history.  In August, 2006, a grand jury indicted the defendant on one charge of murder in the first degree.  He was arraigned in the Superior Court in September, 2006, and pleaded not guilty.  In October, 2007, defense counsel

filed a motion seeking an examination of the defendant for competency pursuant to G. L. c. 123, § 15 (a). The defendant was evaluated for competency in December, 2007, and was found competent to stand trial. In January, 2008, the defendant was committed to Bridgewater State Hospital (Bridgewater) for evaluation pursuant to G. L. c. 123, § 15 (b), after providing notice that he intended to rely on a defense of a lack of criminal responsibility. In February, Bridgewater sought an extension of the commitment, pursuant to G. L. c. 123, § 15 (b). In January, 2009, shortly before the defendant's then-scheduled trial, the judge who was to have been the trial judge ordered the defendant again committed to Bridgewater for observation, pursuant to G. L. c. 123, § 15 (b). Later that month, the Department of Mental Health filed a motion for an extension of the commitment. That motion was allowed. In March, 2009, following a competency hearing, a different judge found the defendant not competent to stand trial, stayed the trial, and ordered the defendant to be held in the Bristol County house of correction for a period of six months, with a status hearing to be conducted at that point. In October, 2009, the Commonwealth sought a competency evaluation, and the judge who had ordered the defendant committed in January, 2009, again ordered him committed to Bridgewater for observation. In February, 2010, after a competency hearing, that judge found the defendant

competent to stand trial.  In August, 2010, after a subsequent evaluation, another judge found the defendant competent.  During the course of the trial in October, 2010, the trial judge (who had not previously been involved in the case) ordered the defendant evaluated for competency based on his behavior in the court room and in a holding cell in the court house.  The judge then found the defendant competent.  At the close of the Commonwealth's case, and again at the close of all the evidence, the defendant moved for a required finding of not guilty by reason of insanity.

Overall, the defendant was the subject of four competency hearings prior to trial, and a fifth competency hearing during trial.  He was found competent to stand trial after the first hearing, incompetent at the second hearing, and competent at the third, fourth, and fifth hearings.[1]

The judge instructed the jury on murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, murder in the second degree, manslaughter, and the defense of not guilty by reason of insanity.  The jury convicted

---

[1] Further details of the competency proceedings are discussed infra, in our consideration of the defendant's challenge of the finding of competency at his third hearing.

the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.[2]

2.  Trial.  We recite the facts the jury could have found, reserving some facts for later discussion.

a.  Commonwealth's case.  In July, 2006, the defendant was working as a dishwasher at a restaurant in Dartmouth.  He had been working at the restaurant for more than three years, and his performance was generally satisfactory, but he sometimes had disputes with the manager (victim) over his use of the dishwasher to wash pots and pans.  The defendant was supposed to use the dishwasher for silverware, glasses, and dishes, but was to wash pots and pans by hand.  The victim repeatedly told the defendant not to put the pots and pans in the dishwasher.  He often would do so anyway, and undertook various methods to conceal this from the victim.  The two argued about the use of the dishwasher on many occasions.

At some point, the defendant began to express his anger about the victim's instructions on dishwashing to other employees.  The defendant told one coworker, "I'm going to kill that f'ing B."  Another coworker reported that, at least once a week, the defendant made gestures such as holding up his middle finger behind the victim's back.  Another coworker said that the

---

[2] At sentencing, the judge ordered that prison authorities be apprised of the defendant's mental condition.

defendant would "have a bung[e]e cord in his hand and he would snap it like he was going to choke [the victim] with it." Approximately two weeks before the stabbing, the defendant told one of his coworkers that he was going to take the victim to the bathroom early in the morning before the restaurant got busy and stab or strangle her. Several of the restaurant employees reported this statement to the victim, but she interpreted it as a joke.

On July 22, 2006, the defendant arrived at work earlier than he did ordinarily. He told the victim that something was wrong with one of the toilets, and they walked toward the women's restroom. Shortly thereafter, the defendant left the restroom and told a coworker that she should telephone 911 because someone had come through the back door with a knife and had stabbed the victim. By the time paramedics arrived, the victim was not breathing. She had been stabbed multiple times, strangled, and beaten. The medical examiner determined that the cause of death was multiple stab wounds, with injury to the aorta, lung, and kidney, and blunt trauma with brain contusions. A knife, a bungee cord, and a pipe from the dishwasher were found in the bathroom stall where the victim's body was found. A membership card for a wholesale club with the name of someone who did not work for the restaurant also was found on the floor near the victim.

While many of the defendant's coworkers were visibly upset at news of what had happened to the victim, the defendant was described as being calm. One of his coworkers noticed that he had blood spots on his face and glasses and was hiding his left hand. The defendant told some coworkers and the investigating officers that the perpetrator was a black man wearing a white shirt, black pants, a dark hooded sweatshirt, white sneakers, leather gloves, and a black mask. He said that the man had come through the back door with a knife and initially tried to stab him, before stabbing the victim and running out the back door. Some of the defendant's coworkers immediately left the restaurant to look for the perpetrator; they were unable to find anyone matching the defendant's description. A police officer with a canine trained to track scents also was unable to locate the suspect the defendant had described.

Several restaurant employees had seen the defendant heading toward the bathroom with the victim, and the investigation almost immediately focused on the defendant. Dartmouth police officers brought the defendant to the police station on the day of the stabbing and interviewed him for a number of hours. The defendant initially told police the same thing he had said at the scene, that an unknown man had burst in through the back door and stabbed the victim. The defendant had visible cuts on one hand and on his left side, which he said he had sustained

when he attempted to defend himself from the victim's assailant. Ultimately, after what the investigating officer described as "confrontational" questioning, the defendant told police that he had stabbed the victim; it was a "mistake," but he did not know "what else . . . he [was] going to do" because she kept "nagging" him.

Deoxyribonucleic acid (DNA) tests on the blood found on the defendant's glasses, socks, and watch matched the victim. The defendant was a potential contributor to blood found on the knife, a handicapped stall in the women's bathroom that had its own sink, and the wholesale club card.

b. Defendant's case. After the Commonwealth rested its case-in-chief, Dr. Ronald Ebert, a forensic psychologist, testified as to the defendant's lack of criminal responsibility on the day of the homicide. The defendant's father also testified to the defendant's medical history, his developmental issues, and his attendance at special education courses throughout his schooling.

The father provided background information on the defendant's mother's medical condition during pregnancy (a uterine infection), the defendant's hospitalization and coma as a result of spinal meningitis when he was six months old, and the first signs of the defendant's developmental deficits, when he was approximately two and one-half years old. The father

described the defendant as testing above age level for certain skills and "well behind" for others. Although he was placed in a special needs program, his ability to communicate verbally with others was "minuscule" and he was resistant to change. The defendant's seizure disorder first became apparent when he was in first or second grade. The defendant resisted taking his seizure medication and was hospitalized at least three times because of seizures.

In elementary school, the defendant would at times act inappropriately, throwing tantrums and sometimes barking and crawling around on all fours. The defendant was prescribed medication for attention deficit disorder. In fourth grade, the defendant transferred to a new school, where he was regularly bullied and beaten up by older students. After that, the defendant began to shut down and interacted with others even less. The defendant's parents were separated when he was ten years old, and were divorced when he was thirteen; after the separation, he lived primarily with his mother. In high school, also in a special needs program, the defendant had "decent" grades and did well in writing, while still demonstrating difficulties with verbal communication.

After graduation, the defendant worked for brief periods at a number of jobs that he obtained through an agency that helped disabled people get jobs and then provided job coaching. He

also qualified for supplemental security income benefits because of his development delays and seizure disorder.  The dishwasher position at the restaurant was the defendant's first long-term job.  The defendant's father drove him to work in the morning, and his mother picked him up in the afternoon; his father picked him up when his mother could not.  The defendant's father would take the defendant to a movie almost every week and noted that there were times when the defendant was unable to distinguish between the fictional people and events in the movies and reality.

Ebert testified to the defendant's medical and educational history, and to the defendant's probable mental state at the time of the crime.  Based on interviews with the defendant, reviews of past records, neurological testing, and other information, Ebert concluded that, at the time of the stabbing, the defendant had been suffering from a mental defect that impaired his ability to conform his conduct to the law or to appreciate the criminality of his actions.  Ebert testified that the defendant suffers from pervasive developmental disorder not otherwise specified, which is a variation of autism.[3]  Although

---

[3] The version of the Diagnostic and Statistical Manual of Mental Disorders in effect at the time of the defendant's diagnosis, the DSM-IV, defines pervasive developmental disorder not otherwise specified as

there was evidence that the defendant had planned the crime in advance, it was a result of his disability, and he had been unable to control his thought processes or behavior.

In rebuttal, the Commonwealth called Dr. Karin Towers, a forensic psychologist who also had interviewed the defendant and had reviewed the relevant records while working as a forensic evaluator at Bridgewater. Towers testified that, in her opinion, the defendant understood the wrongfulness of his actions and had substantial capacity to conform his conduct to the requirements of the law despite his pervasive developmental disorder. She noted that the defendant had made decisions to take the victim into the bathroom where no one could see what was happening and to fabricate the story of the unknown assailant. The defendant also told Towers that he had

---

"a severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests and activities where the criteria are not met for a specific Pervasive Developmental Disorder, Schizophrenia, Schizotypal Personality Disorder, or Avoidant Personality Disorder."

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 84 (4th ed. 2000).

The DSM-IV indicates that "this category includes 'atypical autism.'" Id. The most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-V, notes that "[i]ndividuals with a well-established DSM-IV diagnosis of . . . pervasive developmental disorder not otherwise specified should be given the diagnosis of autism spectrum disorder." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 51 (5th ed. 2013).

considered whether to take the knife with him or to leave it, and that, previously, he had controlled his anger toward the victim.

3. Discussion. In this direct appeal, the defendant raises two claims. First, he challenges the finding that he was competent to stand trial. He focuses particularly on the third competency hearing, and contends that it was error for the judge to find him competent given that both the prosecution and defense experts testified that he was not competent. Second, the defendant challenges the imposition of a mandatory sentence of life imprisonment without the possibility of parole on a developmentally disabled person; he argues that such a sentence is a violation of the Eighth and Fourteenth Amendments to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights.

a. Finding of competency. The defendant specifically challenges the finding of competency after the third hearing. To review adequately the appropriateness of the finding of competency to stand trial at the third hearing, it is necessary to consider the psychiatric evaluations, the previous hearings, and testimony prior to the judge's decision, as well as the two competency hearings that took place after the third hearing.

i. Initial evaluations and proceedings. Following his arraignment, the defendant was ordered to be examined for

competency pursuant to G. L. c. 123, § 15 (a).  In anticipation of the competency hearings, the defendant met with multiple clinicians, who also reviewed his medical and educational history.  Notably, the defendant contracted spinal meningitis when he was six months old; he was hospitalized for several weeks, first in a "stupor" and later in a coma.  The illness resulted in permanent, organic brain injury.  In addition, he has suffered from a seizure disorder since he was a very young child.  While the defendant has tested as being in the borderline to low-average range on intelligence quotient (IQ) tests, he has demonstrated significant impairment in language processing and verbal communication and understanding from the age of two years old.  He has had difficulty in interacting with people, was bullied as a child because of his lack of social skills and inability to communicate, and exhibited outbursts and uncontrollable behavior as a child.  The defendant initially was diagnosed with attention deficit disorder and oppositional defiant disorder, and was treated with medication for hyperactivity.  The defendant attended special education classes throughout his school career, but was able to graduate from high school.

The general consensus of all the experts who testified at the competency hearings, as well as many of the clinicians who examined him as a child and as a teenager, was that the

defendant suffers from what is now known as "pervasive developmental disorder not otherwise specified."

Ebert evaluated the defendant in January, 2007, at the request of the defendant's attorney; Ebert's October, 2007, report was considered at all the pretrial competency hearings. Ebert also referred the defendant to Dr. Nancy Hebben for a neuropsychological evaluation; Hebben conducted an evaluation of the defendant in May, 2007. Ebert testified at the second, third, and fourth competency hearings, and at trial, on behalf of the defendant. Dr. Karin Towers and Dr. Sara Beszterczey performed evaluations as ordered by the court; their reports were also reviewed in conjunction with each of the competency hearings.

Hebben administered a series of tests during the neuropsychological evaluation, which she described in her report. The defendant tested "low normal" or "borderline" in many areas of cognitive functioning, but demonstrated a significant deficit in verbal comprehension ability. Considering all of the results in concert, she concluded that the defendant's most appropriate diagnosis was pervasive developmental disorder not otherwise specified, given his impairments in verbal comprehension and social interaction. Ebert had reached the same diagnosis. He also determined that the defendant suffered from deficits in receptive and expressive

language, poor social skills, and rigidity in his behavior and interests. Ebert concluded that, because of these impairments and the defendant's inability rationally to understand the proceedings against him and to assist his attorney, the defendant was not competent to stand trial. While the defendant could explain theoretically some of the roles of the participants at a trial, he had difficulty in attempting to apply those general concepts to his own situation, suggesting, for example, that if he apologized for his behavior he could go home.

At the first competency hearing, in December, 2007, a court clinician, Dr. Barbara McElroy, testified, based on a brief interview with the defendant and the reports by Ebert and Hebben, that the defendant had a factual and rational understanding of the proceedings against him and therefore was competent to stand trial. McElroy indicated that she had two main concerns: the defendant was not aware of the specific charges he was facing, and did not seem to understand the concept of plea bargains. McElroy concluded, however, that her concerns were minor overall, and that they could be addressed with continued education of the defendant by his attorney. To support this finding, she noted that the defendant had a better understanding when she met with him than he did when he

initially was evaluated by Ebert in January, 2007.  The judge found the defendant competent.

The case was assigned for trial in January, 2009.  At the end of December, 2008, the defendant requested another competency examination.  After an evaluation, a licensed psychologist recommended further evaluation, and the defendant was committed to Bridgewater for observation, pursuant to G. L. c. 123, § 15 (b).  In January, 2009, the Department of Mental Health moved to extend the commitment, and a different Superior Court judge allowed the motion.  In February, 2009, Towers conducted an evaluation of the defendant as ordered by the court In February, 2009, Towers issued a report in which she noted that the defendant possessed a superficial understanding of court proceedings, but that it was unclear whether he truly understood.  A second competency hearing was scheduled.

At the second hearing, in March, 2009, Towers and Ebert both testified that the defendant had a basic factual understanding, but that they were concerned about his ability to make decisions rationally regarding his case.  At times, the defendant would answer their questions without fully understanding what was being asked.  Towers opined that the defendant might be able to overcome his deficits through continued education.  Ebert disagreed, testifying that, although the defendant could repeat information given to him, his

processing of the information and his beliefs would not necessarily change in response to new information.  As an example, Ebert referred to the defendant's belief that he would be able to go home if he apologized to the judge.  The judge noted the difference in the experts' opinions as to possible future competency, but concluded based on the consensus of Towers and Ebert that the defendant was at that time not competent to stand trial.

ii.  <u>Determination of competency at the third hearing</u>.  The third competency hearing took place over the course of three days in January and February, 2010.  In October, 2009, Beszterczey performed an evaluation of the defendant as ordered by the court.  She and Ebert testified at the hearing, along with three of the defendant's former coworkers and the defendant's former job coach.  The lay witnesses testified that, other than his decision to put pots and pans in the dishwasher, the defendant was able to perform his job well, and that they occasionally would have casual conversations with him.  Ebert again opined that the defendant was not competent to stand trial.  Beszterczey commented that she believed the defendant might not be cooperating fully, interfering with her ability to complete a full competency interview, but she did not think that any potential malingering necessarily meant that the defendant was competent.  She concluded that the defendant was presenting

with significant deficits in abilities associated with competency to stand trial, but that it was possible he could become competent with further education.

In a nine-page memorandum and order, a judge who had not previously been involved in the case ruled that the defendant was competent to stand trial. The judge pointed to the defendant's low-average IQ score; his "satisfactory three[-]year job history, where he impressed his [coworkers] by his diligence and essential normality"; the experts' testimony that the defendant's diagnosis had not changed since the time of the killing; and the comments in Beszterczey's evaluation about potential malingering.

iii. <u>Final pretrial competency hearing</u>. Approximately six months later, during a hearing before a different judge, defense counsel requested another competency hearing. The defendant was examined for competency for a fourth time at the end of August, 2010. Dr. Leah Logan, a court-based clinical psychologist, testified after reviewing the defendant's records and meeting with him for approximately one hour. Logan concluded that, while the defendant had needed some questions explained again in simpler terms, he did not have significant deficits, and there was no evidence that his condition had deteriorated since the previous hearing. She suggested that any deficits in understanding the defendant did have could be overcome through

communication with his attorney, repetition and further explanation, and sufficient time for him to process and understand questions he might be asked on cross-examination. The judge determined that there had been no material change since the previous hearing, and therefore that the defendant was still competent to stand trial. He found that the defendant's acknowledged mental impairments did not affect his competency, and that any potential issues could be addressed through preparation prior to trial.

iv. <u>Midtrial competency hearing</u>. On the third day of trial, after the audio-video recording of the defendant's interrogation was played for the jury, a court officer reported to the judge that, during the lunch break, the defendant had begun apparently interacting with an invisible dog. The judge became concerned that the defendant might be decompensating, and decided to bring in the court clinician to examine the defendant, and to review whatever records the clinician felt necessary, in order to determine whether the defendant remained competent. On inquiry by the judge, the defendant's attorney observed that the defendant seemed to "decompensate" more in times of stress, and had been manifesting small signs of stress, such as writing notes to himself and repeating words, while sitting at counsel table during and after the playing of the recording of the interview.

The defendant was examined briefly by Logan.  She testified that she thought the defendant wanted the judge and the attorneys to believe that he was seeing a dog, but that she thought he was not actually having a visual hallucination.  She concluded that the defendant was simply experiencing stress, and provided some recommendations for measures that the defendant might use to handle the trial environment.  The judge concluded, with an oral explanation on the record, that the Commonwealth had fulfilled its burden of proving competency by a preponderance of the evidence.  In reaching that finding, he noted that Logan was a clinical psychologist with forensic experience who was aware of the defendant's history.  The judge additionally relied on his own observations of the defendant over the course of the trial, as well as during the competency hearing, and the reports and findings from the previous competency hearings.

v.  <u>Whether the Commonwealth established the defendant's competency to stand trial</u>.  The defendant appeals from the finding of competency at the third hearing; he contends that the judge abused his discretion by disregarding the experts' consensus that the defendant was not at that time competent to stand trial.  The defendant additionally contends that the judge inappropriately relied on evidence from lay witnesses, who could testify to the defendant's behavior only at the time of the

incident and not at the time of the competency hearing, and that the judge used an improper balancing test by considering the public interest in the prosecution of those who commit crimes to be of equal significance to the due process concern of competency to stand trial.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Commonwealth v. Crowley, 393 Mass. 393, 398 (1984), quoting Drope v. Missouri, 420 U.S. 162, 171 (1975). In the Commonwealth, G. L. c. 123, § 15, allows the examination of a defendant whose competency is called into question.[4]  If a trial judge doubts whether a defendant is competent to stand trial, he or she must, on his or her own initiative, conduct a

---

[4] General Laws c. 123, § 15 (a), provides, in relevant part:

"Whenever a court of competent jurisdiction doubts whether a defendant in a criminal case is competent to stand trial or is criminally responsible by reason of mental illness or mental defect, it may at any stage of the proceedings after the return of an indictment or the issuance of a criminal complaint against the defendant, order an examination of such defendant to be conducted by one or more qualified physicians or one or more qualified psychologists. . . .  When an examination is ordered, the court shall instruct the examining physician or psychologist in the law for determining mental competence to stand trial and criminal responsibility."

full hearing.[5]  See Commonwealth v. Nickerson, 388 Mass. 246, 250

(1983); Commonwealth v. Scionti, 81 Mass. App. Ct. 266, 272-273

(2012).  At a competency hearing, the judge should determine

_____

[5] General Laws c. 123, § 15 (b), (c), provide, in relevant part:

> "(b) After the examination described in paragraph (a), the court may order that the person be hospitalized at a facility or, if such person is a male and appears to require strict security, at the Bridgewater state hospital, for a period not to exceed twenty days for observation and further examination, if the court has reason to believe that such observation and further examination are necessary in order to determine whether mental illness or mental defect have so affected a person that he is not competent to stand trial or not criminally responsible for the crime or crimes with which he has been charged. . . .  If, before the expiration of such twenty day period, an examining qualified physician or an examining qualified psychologist believes that observation for more than twenty days is necessary, he shall so notify the court and shall request in writing an extension of the twenty day period, specifying the reason or reasons for which such further observation is necessary.  Upon the receipt of such request, the court may extend said observation period, but in no event shall the period exceed forty days from the date of the initial court order of hospitalization; provided, however, if the person requests continued care and treatment during the pendency of the criminal proceedings against him and the superintendent or medical director agrees to provide such care and treatment, the court may order the further hospitalization of such person at the facility or the Bridgewater state hospital.

> "(c) At the conclusion of the examination or the observation period, the examining physician or psychologist shall forthwith give to the court written signed reports of their findings, including the clinical findings bearing on the issue of competence to stand trial or criminal responsibility.  Such reports shall also contain an opinion, supported by clinical findings, as to whether the defendant is in need of treatment and care offered by the [Department of Mental Health]."

whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . a rational as well as factual understanding of the proceedings against him."[6]  Commonwealth v. Vailes, 360 Mass. 522, 524 (1971), quoting Dusky v. United States, 362 U.S. 402, 402 (1960).  The Commonwealth has the burden to prove competency by a preponderance of the evidence.  Crowley, 393 Mass. at 400-401.  A judge's competency determination is reviewed for abuse of discretion.  See Commonwealth v. Hung Tan Vo, 427 Mass. 464, 468-469 (1998).

In reaching such a determination, judges may consider their own "observations of the defendant's demeanor and behavior . . . , reports of psychiatric examinations of the defendant, statements to the judge about the defendant's conduct and mental condition, and the testimony of expert witnesses."  Commonwealth v. Hill, 375 Mass. 50, 54-55 (1978).  Observations made closest

---

[6] General Laws c. 123, § 15 (d), provides, in relevant part:

"If on the basis of such reports the court is satisfied that the defendant is competent to stand trial, the case shall continue according to the usual course of criminal proceedings; otherwise the court shall hold a hearing on whether the defendant is competent to stand trial; provided that at any time before trial any party to the case may request a hearing on whether the defendant is competent to stand trial.  A finding of incompetency shall require a preponderance of the evidence.  If the defendant is found incompetent to stand trial, trial of the case shall be stayed until such time as the defendant becomes competent to stand trial, unless the case is dismissed."

to the time of trial are the most appropriate in determining competency. See Commonwealth v. Companonio, 445 Mass. 39, 52 (2005) ("The time frame for determining a defendant's competency to stand trial is 'the condition of the defendant at the time of trial'" [citation omitted]).

While it may be useful for a judge to hear opinions from medical experts, the determination is ultimately a legal, not a medical, judgment. See Kansas v. Hendricks, 521 U.S. 346, 359 (1997) (noting that legal definition of "competency" need not mirror its medical definition). "The law should not, and does not, give the opinions of experts on either side of . . . [an] issue the benefit of conclusiveness." Commonwealth v. DiMinico, 408 Mass. 230, 235 (1990), quoting Commonwealth v. Lamb, 372 Mass. 17, 24 (1977). Cf. Commonwealth v. Kappler, 416 Mass. 574, 579 (1993) (fact finders are not required to accept "uncontroverted testimony of experts"); Commonwealth v. Shelley, 381 Mass. 340, 347 (1980) (fact finder is "not obliged to believe the testimony of any of the expert witnesses").

The judge who conducted the third competency hearing had the authority to exercise his discretion and choose not to credit the experts' conclusions that the defendant was not competent. He used the correct standard to determine competency, appropriately placed the burden on the Commonwealth to prove competency by a preponderance of the evidence, and

wrote a thorough memorandum explaining the reasons for his
conclusion.  Moreover, after that hearing, at subsequent
hearings, two other judges found the defendant competent to
stand trial.  Because competency may be fluid and should be
determined as close to trial as possible, it is most significant
that the defendant was found competent in a hearing during the
trial.  In sum, we discern no error in the judge's determination
at the third competency hearing.

b.  <u>Mandatory imposition of life sentence without
possibility of parole on a developmentally disabled defendant</u>.
The defendant argues also that the mandatory imposition of a
sentence of life imprisonment without the possibility of parole
on a defendant who is developmentally disabled constitutes cruel
and unusual punishment under the Eighth and Fourteenth
Amendments and cruel or unusual punishment under art. 26.  The
defendant asks that we extend the United States Supreme Court's
holding in <u>Atkins</u> v. <u>Virginia</u>, 536 U.S. 304, 321 (2002), that
imposition of the death penalty on a person with an intellectual
disability violates the United States Constitution,[7] to
imposition of a mandatory sentence of life in prison without the

---

[7] <u>Atkins</u> v. <u>Virginia</u>, 536 U.S. 304 (2002), uses the language
"mentally retarded."  That term subsequently has been replaced
by the term "intellectually disabled."  See <u>Hall</u> v. <u>Florida</u>, 134
S. Ct. 1986, 1990 (2014); <u>Commonwealth</u> v. <u>St. Louis</u>, 473 Mass.
350, 357 (2015); Pub. L. 111-256, 111th Cong., 124 Stat. 2643
(2010) (Rosa's Law).

possibility of parole on defendants with developmental disabilities.[8]

---

[8] General Laws c. 123B, § 1, distinguishes between intellectual and developmental disabilities as follows:

"[A] [p]erson with a developmental disability [is] (1) an individual [five] years of age or older with a severe, chronic disability that: (i) is attributable to a mental or physical impairment resulting from intellectual disability, autism, [S]mith-[M]agenis syndrome or Prader-Willi syndrome; (ii) is manifested before the individual attains age [twenty-two]; (iii) is likely to continue indefinitely; (iv) results in substantial functional limitations in [three] or more of the following areas of major life activity: (1) self-care; (2) receptive and expressive language; (3) learning; (4) mobility; (5) self-direction; (6) capacity for independent living; and (7) economic self-sufficiency; and (v) reflects the individual's need for a combination and sequence of special, interdisciplinary or generic services, supports or other assistance that is of a lifelong or extended duration and is individually planned and coordinated; or (2) an individual under the age of [five] who has a substantial developmental delay or specific congenital or acquired condition with a high probability that the condition will result in a developmental disability if services are not provided. . . ."

"[A] [p]erson with an intellectual disability [is] a person who has an intellectual disability, characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social and practical adaptive skills and beginning before age 18, and consistent with the most recent definition provided by the American Association on Intellectual and Developmental Disabilities; provided, that in applying this definition the following shall be considered: (i) limitations in present functioning within the context of community environments typical of the individual's age, peers and culture; (ii) cultural and linguistic diversity and differences in communication, sensory, motor and behavioral factors; (iii) limitations often coexist with strengths within an individual; (iv) an important purpose of describing limitations is to develop a profile of needed

In support of this argument, the defendant relies on cases from the United States Supreme Court holding that imposition of the death penalty on juveniles is unconstitutional, Roper v. Simmons, 543 U.S. 551, 578 (2005); that a mandatory sentence of life without the possibility of parole for nonhomicide offenses committed by juveniles violates the Federal Constitution, Graham v. Florida, 560 U.S. 48, 75 (2010); and that a mandatory sentence of life in prison without the possibility of parole for juveniles who commit murder is unconstitutional, Miller v. Alabama, 567 U.S. 460, 470 (2012).  We have extended the Court's holding in Miller, supra, in deciding that even the discretionary imposition of a sentence of life without the possibility of parole on juveniles is in violation of art. 26. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 674 (2013), S.C., 471 Mass. 12 (2015).

The Commonwealth contends that the defendant's argument would require significant extrapolation from existing precedent, given that the defendant is not a juvenile and is not subject to the death penalty; there is no precedent in this court or the United States Supreme Court concerning prison sentences for developmentally disabled individuals.  Furthermore, the

supports; and (v) with appropriate personalized supports over a sustained period, the life functioning of a person with an intellectual disability will generally improve . . . ."

Commonwealth argues, adults with intellectual or developmental disabilities may not have the same prospects for rehabilitation as do juveniles, whose brains have not yet fully matured. The Commonwealth maintains that much of the reasoning underlying the United States Supreme Court's and this court's jurisprudence on sentences for juveniles does not apply in this case because, unlike juveniles, who act impulsively and are unduly influenced by others due to their lack of maturity, the defendant has an immutable condition, did not act impulsively, and was not unduly influenced by others.

The Eighth Amendment and art. 26 "draw [their] meaning from the evolving standards of decency that mark the progress of a maturing society." Atkins, 536 U.S. at 311-312, quoting Trop v. Dulles, 356 U.S. 86, 101 (1958). See Diatchenko, supra at 669; Libby v. Commissioner of Correction, 385 Mass. 421, 435 (1982) ("Article 26, like the Eighth Amendment, bars punishments which are 'unacceptable under contemporary moral standards'" [citation omitted]). In deciding whether a punishment is cruel and unusual, courts look to "'objective indicia of society's standards' . . . to determine whether there is a national consensus against the sentencing practice at issue." Graham, 560 U.S. at 61, quoting Roper v. Simmons, 543 U.S. at 563. See Good v. Commissioner of Correction, 417 Mass. 329, 335 (1994) ("In divining contemporary standards of decency, we may look to

State statutes and regulations, which reflect the public attitude as to what those standards are"). Courts also "determine in the exercise of [their] own independent judgment whether the punishment in question violates" contemporary moral standards to the extent that it is a constitutional violation. See Graham, supra.

"[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures" (quotations and citation omitted). Atkins, 536 U.S. at 312. Courts that have addressed this issue to date have declined to extend Atkins, supra, and Miller, supra, to disallow mandatory sentences of life without parole for people with intellectual or developmental disabilities, largely in unpublished or unreported opinions. See State v. Little, 200 So. 3d 400, 405 (La. Ct. App. 2016) (rejecting downward departure from mandatory sentence of life without parole for defendant with developmental disability). See also Pifer, Is Life the Same as Death?: Implications of Graham v. Florida, Roper v. Simmons, and Atkins v. Virginia on Life Without Parole Sentences for Juvenile and Mentally Retarded Offenders, 43 Loy. L.A. L. Rev. 1495 (2010).

This court has "the inherent authority to interpret [S]tate constitutional provisions to accord greater protection to individual rights than do similar provisions of the United

States Constitution" (quotations and citation omitted). Diatchenko, 466 Mass. at 668. We did so in Diatchenko, supra at 669, where we held that "the imposition of a sentence of life in prison without the possibility of parole for the commission of murder in the first degree by a juvenile under the age of eighteen is disproportionate not with respect to the offense itself, but with regard to the particular offender." In that case, we considered scientific evidence on adolescent brain development and how it may affect a juvenile's personality and behavior. Id. at 669-671.

Similarly, in Atkins, 536 U.S. at 318, the United States Supreme Court determined that intellectually disabled individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," leading them to be less culpable than other offenders. The Court therefore focused on two reasons categorically to exclude individuals with intellectual disabilities from execution. Id. at 318. First, neither justification for the death penalty, retribution or deterrence, applies to intellectually disabled defendants. Id. at 318-319. Because intellectually disabled individuals are less culpable, their actions do not merit that level of retribution, and their impairments make it less likely

that they can be deterred by the possibility of the death penalty.  Id. at 319-320.  Second, intellectually disabled individuals may receive the death penalty more frequently than they should, based on the facts of their cases, because of the increased possibility of false confessions and the lesser ability of intellectually disabled defendants to make a persuasive showing of mitigation.  Id. at 320-321.  These concerns are less extreme, however, when an individual is facing a prison sentence, even when it is life without parole, than when an individual faces the death penalty.

At this time, we decline to extend Atkins, supra, and Miller, supra, either to eliminate sentences of life in prison without the possibility of parole for people with developmental disabilities or to require that such sentences be discretionary rather than mandatory.  Whether it is cruel and unusual under the Eighth and Fourteenth Amendments or cruel or unusual under art. 26 to impose a mandatory sentence of life without parole on a person with an intellectual disability is a difficult question that is not before us here, where the defendant has been diagnosed with a developmental disability.

c.  Relief pursuant to G. L. c. 278, § 33E.  The defendant asks that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the verdict to murder in the second degree.  After carefully reviewing the

record pursuant to our duty under G. L. c. 278, § 33E, we decline to set aside the verdict or to reduce the degree of guilt.

<u>Judgment affirmed</u>.